COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| DUSTY RAY PAINTER, INDIVIDUALLY AND AS NEXT FRIEND OF DEZARAY NICOLE SPEER AND SUMMER DAWN PAINTER, MINORS, AND TINA PERKINS, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF JESSE PERKINS, DECEASED, | § § § § § § | No. 08-07-00112-CV Appeal from the 112th District Court of Upton County, Texas |
| Appellants, | § | (TC# 05-01-U3880-IDO) |
| v. | | (consolidated w/05-04-U3880-IDO) |
| MOMENTUM ENERGY CORPORATION, McGUIRE INDUSTRIES, INC., AND XACT TECHNOLOGIES, INC., | § § § § | |
| Appellees. | | |

**O P I N I O N**

Appellants, Dusty Ray Painter, Individually and as next friend of minors Dezaray Nicole Speer and Summer Dawn Painter and Tina Perkins, individually and as representative of the Estate of Jesse Perkins, deceased, appeal the trial court's grant of summary judgment in favor of Momentum Energy Corporation, McGuire Industries, Inc. ("McGuire"), and Xact Technologies, Inc. We affirm the judgment of the trial court.

**I. BACKGROUND**

On August 7, 2004, Jesse Perkins and Dusty Painter were employees of Robinson Drilling of Texas, Ltd. ("Robinson"), when Perkins was killed and Painter paralyzed after having been struck by a rotating head that fell from the top of a blowout preventer during disassembly of a drilling rig at the Lindsey No. 1 well site in Upton County. Robinson had been hired by Momentum, the

operator, to drill a well, pursuant to an IADC Drilling Bid Proposal and Footage Drilling Contract (the "Drilling Contract").

Momentum, the 100 percent owner of the leasehold working interest of the relevant mineral property, hired Xact to provide a contract representative to oversee certain aspects of the operation, including the running of casings, cementing the casings, setting the slips, electric logging, and drill-stem testing. Xact hired Melvin Fesler to serve as the contract representative for itself and Momentum.

On the date of the accident, the well had reached total depth and Robinson employees were in the process of rigging down the drilling rig. As part of the process, Robinson employees had to remove the casing from the blowout preventer stack and lay the blowout preventer on the ground. The blowout preventer is a large, heavy piece of equipment. The rotating head, a separate piece of equipment that weighs approximately 2,000 pounds, was bolted to the top of the blowout preventer. The blowout preventer was owned by Robinson, while the rotating head was rented from McGuire. Painter and Perkins worked on the daylight tour, which ran from 6 a.m. until 2 p.m.

Robinson employees on the previous shift had removed or loosened some of the bolts securing the rotating head to the top of the blowout preventer in anticipation of hoisting it off of the blowout preventer, before laying the preventer on the ground. At the time of the accident, there remained two bolts securing the rotating head to the preventer, and the nuts attached to the bolts were only hand-tightened. The fact that some of the bolts had been removed and others loosened was not communicated to the members of the daylight tour.

The daylight tour employees sought to remove the blowout preventer from the rig by removing it with the rotating head still attached. The daylight crew attached the draw works towards the top of the blowout preventer in order to lift it, and attached an air hoist to the bottom of the

blowout preventer to pull the lower portion of preventer out and tilt it. The crew then lifted the

blowout preventer, pulled the bottom aside, and began to lay it over. When they did so, the rotating

head fell from the top of the preventer, killing Perkins and severely injuring Painter.

Painter and Perkins brought suit against Momentum and Xact, based on premises liability,[1]

and against McGuire, based on strict liability, negligence, and breach of warranty. Momentum and

Xact both filed traditional and no-evidence motions for summary judgment. They argued that

chapter 95[2] of the Texas Civil Practices and Remedies Code applied to the claims against them and

that they were entitled to summary judgment, because there was no evidence that either exercised

---

[1] Perkins settled her claims against Xact and McGuire prior to this appeal.

[2] The relevant portions of chapter 95, upon which Momentum and Xact rely, provide as follows:

In this chapter:
     (1) "Claim" means a claim for damages caused by negligence, including a counterclaim, cross-claim, or third party claim.
     (2) "Claimant" means a party making a claim subject to this chapter.
     (3) "Property owner" means a person or entity that owns real property primarily used for commercial or business purposes.

TEX. CIV. PRAC. & REM. CODE ANN. § 95.001.

This chapter applies only to a claim:
     (1) against a property owner, contractor, or subcontractor for personal injury, death, or property damage to an owner, a contractor, or a subcontractor or an employee of a contractor or subcontractor; and
     (2) that arises from the condition or use of an improvement to real property where the contractor or subcontractor constructs, repairs, renovates, or modifies the improvement.

TEX. CIV. PRAC. & REM. CODE ANN. § 95.002.

A property owner is not liable for personal injury, death, or property damage to a contractor, subcontractor, or an employee of a contractor or subcontractor who constructs, repairs, renovates, or modifies an improvement to real property, including personal injury, death, or property damage arising from the failure to provide a safe workplace unless:
     (1) the property owner exercises or retains some control over the manner in which the work is performed, other than the right to order the work to start or stop or to inspect progress or receive reports; and
     (2) the property owner had actual knowledge of the danger or condition resulting in the personal injury, death, or property damage and failed to adequately warn.

TEX. CIV. PRAC. & REM. CODE ANN. § 95.003.

control over Robinson and its employees and no evidence that either had actual knowledge of the danger. Momentum and Xact also filed for summary judgment on common law negligence claims, in the event that chapter 95 was deemed inapplicable. McGuire moved for traditional and no-evidence summary judgments on all of the claims against it. After a hearing on the various motions, the trial court granted summary judgment in favor of Momentum, Xact, and McGuire. The trial court did not specify the grounds for its judgment.[3]

## II. DISCUSSION

### A. Standard of Review

The standard of review for a traditional summary judgment asks whether the movant carried the burden of showing that there is no genuine issue of material fact, so that judgment should be granted as a matter of law. *Diversicare Gen. Partner, Inc. v. Rubio*, 185 S.W.3d 842, 846 (Tex. 2005); *De Santiago v. West Tex. Cmty. Supervision & Corr. Dep't*, 203 S.W.3d 387, 398 (Tex. App. --El Paso 2006, no pet.). Summary judgment is proper if the defendant disproves at least one element of each of the plaintiff's causes of action, *D. Houston, Inc. v. Love*, 92 S.W.3d 450, 454 (Tex. 2002), or establishes all elements of an affirmative defense to each claim, *Shah v. Moss*, 67 S.W.3d 836, 842 (Tex. 2001). Once the movant establishes a right to judgment as a matter of law, the burden shifts to the non-movant to produce evidence raising a genuine issue of material fact. *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678-79 (Tex. 1979). When reviewing a summary judgment, we take as true all competent evidence favorable to the non-movant, and we indulge every reasonable inference and resolve any doubts in the non-movant's favor. *Southwestern Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex. 2002) (citing *Science Spectrum, Inc. v.*

---

[3] Where the trial court grants a summary judgment without stating its grounds for doing so, we will affirm, if any of the theories advanced below is meritorious. *See Harwell v. State Farm Mut. Auto. Ins. Co.*, 896 S.W.2d 170, 173 (Tex. 1995).

*Martinez*, 941 S.W.2d 910, 911 (Tex. 1997)).

The Texas Rules of Civil Procedure also permit a party to move for a no-evidence summary judgment "without presenting summary judgment evidence," but they require the moving party to "state the elements as to which there is no evidence." TEX. R. CIV. P. 166a(i); *Aguilar v. Morales*, 162 S.W.3d 825, 834 (Tex. App.--El Paso 2005, pet. denied). The burden then shifts to the non-movant to produce summary judgment evidence raising a genuine issue of material fact regarding each element challenged in the motion. *Aguilar*, 162 S.W.3d at 834.

A no-evidence motion for summary judgment is essentially a pretrial directed verdict, and we apply the same legal sufficiency standard of review. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 750-51 (Tex. 2003), *cert. denied*, 541 U.S. 1030 (2004). We view the evidence in the light most favorable to the non-movant, and we must disregard all contrary evidence and inferences. *Id.* at 751. A genuine issue of material fact is raised if the non-movant produces more than a scintilla of evidence regarding the challenged element. *Id.* There is not a scintilla of evidence when the evidence is so weak as to do no more than create a mere surmise or suspicion of material fact. *Ianni v. Loram Maint. of Way, Inc.*, 16 S.W.3d 508, 513 (Tex. App.--El Paso 2000, pet. denied). Evidence that fails to constitute more than a mere scintilla is, in legal effect, no evidence at all. *Lozano v. Lozano*, 52 S.W.3d 141, 148 (Tex. 2001).

**B. Momentum's Traditional and No-Evidence Motions for Summary Judgment**

In its no-evidence motion for summary judgment, Momentum argued that chapter 95 of the Civil Practice and Remedies Code applies to the negligence claims against it and that there was no evidence that Momentum exercised or retained control over the manner in which Robinson

(including Perkins and Painter) performed their work.[4] Momentum also argued that there was no evidence that it had actual knowledge of the danger or condition resulting in Perkins' death and Painter's injury. Momentum argued that, even if chapter 95 were inapplicable, there was no evidence under a common-law negligence claim that Momentum owed a duty to Perkins and Painter, and no evidence of any breach of duty by Momentum that proximately caused their injuries.

Momentum asserted the same grounds with regard to chapter 95 in its traditional motion for summary judgment. With regard to the negligence claims against it, Momentum argued that it did not owe a duty to Perkins and Painter, because it did not exercise control, or have contractual control, over Robinson and its employees.

As evidence in support of its traditional motion, Momentum attached the affidavit of Melvin Fesler. In his affidavit, Fesler stated that he was retained as an independent contractor by Xact Technologies to serve as a contract representative for Momentum on the Lindsey No. 1 Well for the sole purposes of overseeing the running of the casings, cementing the casings, setting the slips, electric logging, and drill-stem testing. Fesler stated that, at the time of the accident, Robinson's employees were in the process of laying down Robinson's blowout preventer and that he was not retained to oversee or supervise this process. Fesler further stated that he did not, at any time, exercise or retain control over the manner in which the work was performed by Robinson's employees in laying down the blowout preventer, including the removal of the bolts or studs that secured the rotating head. Fesler also stated that, prior to the accident, he was unaware of the method that Robinson used to remove the rotating head and that he had no actual knowledge of the danger or condition that resulted in Perkins' death or Painter's injury. Fesler further stated that he

---

[4] Momentum brought separate motions against Painter and Perkins, each of which included both no-evidence and traditional summary judgment grounds. The motions are substantially similar.

was unaware that anyone had removed or loosened the bolts or studs that secured the rotating head, that he did not look at or inspect the studs or bolts that secured the rotating head, and that he was unaware that Perkins and Painter were standing beneath the blowout preventer prior to the accident.

Momentum also attached the affidavit of Louie Michael Cure, Xact Technologies' drilling superintendent at the relevant time period. Cure confirmed that Xact was retained by Momentum to provide it with a contract representative for the sole purposes of overseeing the running of the casings, cementing the casings, setting the slips, electric logging, and drill-stem testing. Cure stated that Fesler was not retained to oversee or supervise Robinson's employees during any work preparatory to laying down the blowout preventer. Cure further stated that Xact did not exercise or retain control over the manner in which Robinson performed its work, including the manner in which Robinson did preparatory work to lay down the blowout preventer, including the removal of studs or bolts from the rotating head. According to Cure, prior to the accident, Xact had no actual knowledge of the danger or condition that resulted in Perkins' death and Painter's injury and was not aware that anyone had removed or loosened the bolts or studs that secured the rotating head. Cure further stated that Xact was not aware of the method by which Robinson's employees intended to remove the rotating head and was not aware that Perkins and Painter were standing beneath the head.

Momentum also attached the affidavit of Sammie Lynn Hodges, Momentum's operations foreman during the relevant time period. Hodges stated that Momentum owned record title to 100 percent of the leasehold working interest in the subject mineral estate and that, prior to and at the time of, the accident, Momentum was using the property for commercial and business purposes. Hodges stated that Momentum retained Xact to provide a contract representative at the well for the sole purposes of overseeing the running of the casings, cementing the casings, setting the slips, electric logging, and drill-stem testing. Fesler was Momentum's only contract representative and

its only representative present at the well. Hodges further stated that, at no time, did Fesler communicate with Momentum as to the preparations to lay down the blowout preventer, the method by which Robinson intended to remove the rotating head, or the removal and loosening of studs and bolts from the head. Hodges also stated that Momentum did not exercise or retain control over the manner in which work was performed by Robinson's employees, nor did it retain Xact to do so. Hodges stated that Momentum did not have actual knowledge of the method used by Robinson to remove the rotating head, of the removal and loosening of studs and bolts from the head, or where Perkins and Painter were standing at the time of the accident. The Drilling Contract between Momentum and Robinson was attached as an exhibit to the affidavit.

In their responses to Momentum's motions, Perkins and Painter argued that, because the Drilling Contract provided that "[o]perator shall be solely responsible and assumes liability for all consequences of operations by both parties while on a daywork basis," chapter 95 was inapplicable. Perkins and Painter also argued that the Drilling Contract provided that daywork labor provided by Robinson would be under the direction, supervision, and control of Momentum. In addition, they argued that Fesler was Momentum's company representative, that he exercised actual control over the manner and means of the operation, that he had actual knowledge of the danger, and that he failed to adequately warn of the danger.

Among other things, Perkins and Painter attached the Drilling Contract, billing records from Xact to Momentum for Fesler's work, and excerpts from the deposition of Martin Spadinger, Momentum's president. Spadinger testified that Momentum hired Xact to be its company representative at the well for the daily drilling operations and that such representative was generically known in the industry as a "company man." Perkins and Painter also attached deposition excerpts of Robert Robinson, the president of GR Robinson Management, L.C., the managing general partner

of Robinson Drilling of Texas, Ltd., who testified that the company man, if he was with the toolpusher, had the "ultimate say-so" about the operation as the well was being finished, that he had the power and responsibility to talk to Robinson's toolpusher about what he wanted done on the rig at the time of the completion procedures, and that he had the right and the responsibility to dictate the manner and means of the completion procedures.

Appellants also attached deposition excerpts from Fesler's deposition. Fesler testified that a company man is present to see that everything is done according to standards for running casing and, while the crew is on day-work, to see that everything is done according to "specs." Fesler also testified that the company man is "the one that went out there and made sure that the casing was right, everything went right, everything was in place, and everything was run at the right place . . . ." Fesler testified that, when the crew started pulling the casing out, he told a couple of hands who were standing close to the cellar to "come over there out of the way" because "you don't stand under that V-door when they're laying pipe down." Fesler then walked to the toolpusher's truck at the edge of the site and asked the toolpusher whether he had released the rotating head.

### 1. Applicability of Chapter 95

In their first issue, Appellants argue that chapter 95 of the Civil Practice and Remedies Code does not apply to Momentum or Xact, because claims arising from a drilling operation are not claims arising from the use and condition of an improvement to real property. Section 95.002 of the Code provides that the chapter applies only to a claim (1) against a property owner, contractor, or subcontractor for personal injury, death, or property damage to an owner, contractor, or subcontractor (2) that arises from the condition or use of an improvement to real property, where the contractor or subcontractor constructs, repairs, renovates, or modifies the improvement. TEX. CIV. PRAC. & REM. CODE ANN. § 95.002. Section 95.001 defines a "property owner" as "a person or entity that owns

real property primarily used for commercial or business purposes." TEX. CIV. PRAC. & REM. CODE ANN. § 95.001.  By virtue of its ownership of the mineral interests relevant to the Lindsey No. 1 Well, Momentum is a property owner as defined by section 95.001.  *See Chi Energy, Inc. v. Urias*, 156 S.W.3d 873, 879 (Tex. App.--El Paso 2005, pet. denied) (chapter 95 held applicable to the owner of the leasehold interest in an oil well); *Francis v. Coastal Oil & Gas Corp.*, 130 S.W.3d 76, 84 (Tex. App.--Houston [1st Dist.] 2003, no pet.) (oil and gas lessee who used the subject property for the commercial and business purposes of producing and marketing oil and gas held a property owner under chapter 95).

Appellants  argue that their negligence claims involve the rotating head that was attached to Robinson's drilling rig and that neither the head nor the rig was an improvement to real property. However, chapter 95 applies to a claim for personal injury "that arises from the condition or use of an improvement to real property where the contractor or subcontractor constructs, repairs, renovates, or modifies the improvement." TEX. CIV. PRAC. & REM. CODE ANN. § 95.002(2).  Courts have held that chapter 95 applies, despite the fact that the object causing the injury is not itself an improvement, where the injury arises from work being done on an improvement.  *Fisher v. Lee & Chang P'ship*, 16 S.W.3d 198, 200-02 (Tex. App.--Houston [1st Dist.] 2000, pet. denied); *Spears v. Crown Central Petroleum Corp.*, 133 Fed. Appx. 129, 131 (5th Cir. 2005) (affirming summary judgment for defendant in case where plaintiff was injured after tripping on hoses while on premises to perform maintenance on a heat exchanger); *Admire v. H.E. Butt Grocery Co.*, No. 01-02-00060-CV, 2003 WL 203514, at *2 (Tex. App.--Houston [1st Dist.] January 30, 2003, no pet.) (injuries resulting from fall from ladder leading to roof of building where contractor was repairing refrigeration units arose from use of an improvement to the property under section 95.003); *Moreno v. BP Am. Prod. Co.*, No. 04-08-00036-CV, 2008 WL 4172248, at *2 (Tex. App.--San Antonio Sept.

10, 2008, no pet. h.) (chapter 95 applied to injuries suffered by contractor's employee while unloading pipe at well site).

Appellants also argue that the drilling work performed by Robinson did not constitute the construction of an improvement to real property under section 95.002(2). Appellants rely on *Holley v. NL Indus./NL Acme Tool Co.*, 718 S.W.2d 813, 814-15 (Tex. App.--Austin 1986, writ ref'd n.r.e.). In that case, the Austin Court of Appeals stated that "[t]he drilling of an oil well does not involve construction, in the sense of assembling materials to make a permanent whole. The drilling rig, itself, is not a permanent fixture, but rather is removed from the well-site after drilling is completed." *Id*. at 815. The issue in *Holley* was whether a contract for the drilling of an oil well was a construction contract, as defined by section 162.001(a) of the Texas Property Code, such that a contractor that furnished materials for the drilling operation would be entitled to construction contract trust funds.[5] *Id*. at 813-14. The *Holley* court concluded that the drilling of an oil well did not constitute an improvement, because the drilling rig itself was not a permanent fixture and because "[d]rilling a hole in the ground does not involve the assembly of various materials into a permanent structure." *Id*. at 815. The court noted further that casing pipe involved permanent construction, but the court reasoned that it was placed in the hole simply to preserve the hole and prevent it from collapsing.

Appellees point to *Francis*, where the employee of an independent contractor brought an action against the operator of an oil well for injuries sustained during an explosion. The employee, relying on *Holley*, argued that chapter 95 did not apply to his negligence claim, because, as a matter of law, an oil well is not an improvement to real property. 130 S.W.3d at 84-85. The *Francis* court

---

[5] Section 162.003 creates a trust fund of monies paid to contractors for work performed by certain beneficiaries who furnish labor or material for the construction or repair of an improvement on real property. TEX. PROP. CODE ANN. § 162.003.

noted that "*Holley* focuses solely on whether 'construction,' specifically the activity of drilling, constitutes an improvement under the construction-payments provisions of the Property Code." *Id.* at 85. The court also distinguished *Holley* on the ground that it dealt with drilling, "in contrast to the well that remains after the drilling." *Id.*

Momentum also relies on *Credeur v. MJ Oil Inc.*, 123 Fed. Appx. 585, 2004 WL 2914039 (5th Cir. Dec. 15, 2004) (not designated for publication). In *Credeur*, an employee of a contractor hired to perform various services in support of drilling an oil well, including mud filtration, was injured when he partially fell through a hatch accessing the mud tank. *Id.* at 587, 2004 WL 2914039, at *1. The district court granted summary judgment in favor of the operator, on the grounds that chapter 95 provided the employee's exclusive remedy and that he did not establish liability under the statute. *Id.* On appeal, the employee argued that chapter 95 did not apply to his work on the rig, because it was not construction, repair, renovation, or modification of an improvement. *Id.* at 588, 2004 WL 2914039, *2. The Fifth Circuit disagreed, and, relying on *Francis*, concluded that activity facilitating a well's performance was construction, renovation, or modification. *Id.*

"There can be no improvement without annexation to realty, and until personalty is annexed to realty, it by definition cannot be an improvement." *Sonnier v. Chisholm-Ryder Co.*, 909 S.W.2d 475, 479 (Tex. 1995). Whether personalty has become affixed to realty, such that it constitutes an improvement, depends upon: (1) the mode and sufficiency of annexation; (2) the adaptation of the personalty to the use or purpose of realty; and (3) the intention of the owner. *Id.* The third factor is preeminent, and the first two factors are considered evidence of intent. *Id.* "The class of improvements is considered to be broader than that of fixtures, which are items of personalty that have become permanent parts of the realty to which they are affixed." *Reames v. Hawthorne-Seving, Inc.*, 949 S.W.2d 758, 761 (Tex. App.--Dallas 1997, pet. denied) (holding that conveyor belt with

wheels was constructively annexed to property).

There is no evidence in this case that speaks to Momentum's intent with regard to the well. In its reply brief and at oral argument, Appellants argued that drilling a well was not an improvement, because there was no annexation of personalty to realty. Appellants submitted summary judgment evidence in the form of Xact's invoices to Momentum. The invoices show charges for cementing the casing into the well, and it is undisputed that this occurred. There was thus an attachment of personalty to realty.

Appellants do not dispute that a completed well is an improvement. Instead, they seek to distinguish the act of drilling a well from the construction of a well structure, once drilling is complete. What Appellants have not explained, however, is how a well may be constructed without drilling. It is axiomatic that the drilling and the installation of casing is an integral part of the construction of a well and that, without drilling, there can be no well. Drilling and the completion of drilling operations are more properly characterized as an essential part of the construction of a well, as opposed to some preliminary, unrelated task. We conclude that, in the context of section 95.002, Appellants were involved in the construction of an improvement to real property. *See Moreno*, 2008 WL 4172248, at \*2 (chapter 95 applied to injuries suffered by contractor's employee, where contractor was hired to drill and set conductor pipe at a well site).

## 2. Actual Knowledge of the Danger or Condition

In order for liability to be imposed, section 95.003 requires that a plaintiff show that the property owner "exercises or retains some control over the manner in which the work is performed, other than the right to order the work to start or stop or to inspect progress or receive reports." TEX. CIV. PRAC. & REM. CODE ANN. § 95.003(1). In addition, a plaintiff must show that "the property owner had actual knowledge of the danger or condition resulting in the personal injury, death, or

property damage and failed to adequately warn." *Id.* § 95.003(2); *see also Ellwood Tex. Forge Corp. v. Jones*, 214 S.W.3d 693, 700 (Tex. App.--Houston [14th Dist.] 2007, pet. denied) (chapter 95 requires that a plaintiff show both control and actual knowledge of the danger in order to prevail).

With regard to actual knowledge of the danger or condition, Appellants first argue that neither Xact nor Momentum provided Fesler with a safety manual or training for his services as a company man at the well site. Even if we assume that this is relevant to Momentum's actual knowledge, we note that the deposition testimony referenced shows merely that Xact did not train people to be company men, because it hired persons with several years of experience in the field after conducting interviews to determine this. Xact did, however, require safety training once every month or two, which Fesler apparently attended. Appellants also argue that, prior to the accident, Fesler directed Robinson crew members to move away from a certain area at the well site, because of the danger of getting hit by something during disassembly of the drilling rig.

In his summary judgment response, Painter relied on various portions of Fesler's deposition testimony, including the following:

> They started pulling the casing out. And there was a couple of hands that was standing over close to the cellar then. And I told them to come over there out of the way. And then I walked off to the company man's pickup while they were laying the pipe down because you don't stand under that V-door when they're laying pipe down.
>
> .  .  .
>
> Q: Where was the BOP at whenever they were lifting the casing and you told--
>
> A: It was still hung on the blocks.
>
> Q: Okay. And then you told some--you told two of them to watch out for the pipe?
>
> A: Yeah. I told them to watch out for the pipe, because you go to laying stuff down, you don't stand under there where something can hit you.

Appellants argue that Fesler's testimony establishes his knowledge of the danger of being

hit by something falling during dismantling of the drilling rig. They contend that, although Fesler may not have had knowledge of the dangerous condition of the rotating head (because of its being secured by only two bolts), he had knowledge of the danger of its falling from above.

Appellants concede that their summary judgment evidence fails to show that Fesler had any knowledge that the rotating head was only secured by two bolts. The evidence shows only that Fesler was aware of the danger of being hit by casing or pipe when it is being removed and laid down, not of the danger of being hit by the rotating head. Moreover, it is undisputed that Fesler walked away from the well site at the time that the Robinson employees attempted to remove the blowout preventer and rotating head. The danger or condition that resulted in the accident was the fact that the rotating head was secured with only two hand-tightened bolts. Fesler's knowledge of the possibility of being hit by pipe or casing as it is being laid down is not sufficient to satisfy the requirement that a property owner have actual knowledge of the danger or condition that caused the injury.

Pursuant to chapter 95, a property owner owes a duty to warn only of known dangers. *Fisher*, 16 S.W.3d at 202 (landowner who did not have knowledge of defective ladder had no duty to warn); *see also Rueda v. Paschal*, 178 S.W.3d 107, 109-10 (Tex. App.--Houston [1st Dist.] 2005, no pet.) (affirming summary judgment in favor of property owner where the plaintiff produced no evidence that property owner was aware of alleged defect in ladder); *Kelly v. LIN Television of Texas, L.P.*, 27 S.W.3d 564, 572 (Tex. App.--Eastland 2000, pet. denied) (negligence in failing to inspect tower for stress fractures not equivalent to actual knowledge under chapter 95); *James v. Cousins Props. Tex., L.P.*, No. 03-06-00617-CV, 2008 WL 2220016 (Tex. App.--Austin May 30, 2008, no pet.) (mem. op.) (requisite knowledge pursuant to chapter 95 was not knowledge of the danger in placing portable toilet on sidewalk, but rather knowledge that toilet had been placed on sidewalk with wheels

unlocked); *Bishop v. Nabisco, Inc.*, No. 14-03-00639-CV, 2004 WL 832916, at *3 (Tex. App.--Houston [14th Dist.] Apr. 20, 2004, no pet.) (knowledge that object that caused injury could be potentially harmful if working with large equipment nearby was not equivalent to actual knowledge that object itself was dangerous).

We overrule this issue. Because we have determined that there was no evidence of actual knowledge, we do not address the issue of control, as it relates to Momentum.

### 3. Contractual Liability

The trial court's summary judgment provided that Appellants take nothing by their claims against Momentum, Xact, and McGuire. Appellants argue that chapter 95 does not apply to the contractual claims that they asserted against Momentum. They further argue that, under the terms of the Drilling Contract, Momentum assumed liability for the accident. In this regard, Appellants rely on a provision contained in the introductory paragraph of the Drilling Contract, a portion of which provides, "[e]xcept for such obligations and liabilities specifically assumed by Contractor, Operator shall be solely responsible and assumes liability for all consequences of operations by both parties while on a Daywork Basis, including results and all other risks or liabilities incurred in or incident to such operations." In addition, Appellants rely on section 19.9(b) of the Drilling Contract, which provides that "Contractor will preassemble, disassemble, or assemble materials to be furnished by Operator only when directed by Operator and when such work can be accomplished by normal rig personnel. All of such services shall be performed on a Daywork Basis, Operator shall release Contractor from, and shall protect, defend and indemnify Contractor from and against any liability for such service." Appellants argue that they were working on a daywork basis at the time of the injury and that, as a consequence, Momentum is contractually liable for the death and injuries that resulted from the accident.

We need not reach the issue of whether chapter 95 applies to Appellants' purported contract claims, for the simple reason that Appellants did not assert a contract claim against Momentum. Appellants argue that they plead a breach of contract claim. The petitions, which are substantially similar with regard to Painter and Perkins, contain one section detailing the claims against Momentum, Xact, and McGuire. The heading for this section is entitled "Plaintiff's Claims of Negligence and Products Liability Claims." The opening sentence of this section in Painter's petition reads, "[t]his lawsuit is brought because of the horrific injuries received by Plaintiff Dusty Painter because of the negligence of Defendants." Similarly, the opening sentence in Perkins' petition reads, "[t]his lawsuit is brought because of the horrific injuries and death of Jesse Perkins because of the negligence of Defendants . . . ." Both petitions then proceeded to allege facts relating to the accident, asserting that Momentum and Xact had a duty to supervise the drilling operation in one paragraph, and Perkins (but not Painter) alleged that Fesler maintained actual control and direction over the dismantling of the rig in the next paragraph. In the following paragraph, both Painter and Perkins allege that Momentum and Xact "were further contractually liable for the safety of the drilling operation in question at the time of the injuries alleged herein. Defendants were exercising actual control over the drilling operation at the time of the accident in question." In her prayer, Tina Perkins, requested wrongful death damages, mental anguish damages, and medical and counseling expenses. In his prayer, Painter sought damages for medical bills, lost wages and earning capacity, pain and mental anguish, loss of consortium, and exemplary damages.

The Rules of Civil Procedure require that a petition set forth "a short statement of the cause of action sufficient to give fair notice of the claim involved." TEX. R. CIV. P. 47(a). A fair reading of Appellants' live petitions does not reveal the pleading of a contract claim. The statement that Momentum and Xact were "contractually liable for the safety of the drilling operation" was alleged

among various other allegations concerning Momentum and Xact's duty to supervise and control the drilling operation. The following sentence alleges that Momentum and Xact had "actual control" over the drilling operation. As previously noted, all of these allegations were pled under the heading that denoted negligence and product liability claims. In addition, neither Appellant sought any damages that would indicate a contract claim. While this certainly provides notice as to Appellants' allegations concerning Momentum's assertion of contractual and actual control over the operation for the purposes of a negligence claim, they do not provide notice of a contract claim against Momentum. *See Eikon King St. Manager, L.L.C. v. LSF King St. Manager, L.L.C.*, 109 S.W.3d 762, 771 (Tex. App.--Dallas 2003, pet. denied) (passing reference to a covenant of good faith in single sentence under section of pleading labeled "breach of contract," was not sufficient to put opposing party on fair notice of claim for breach of the duty of good faith and fair dealing). We overrule this issue.

### C. Xact's Traditional and No Evidence Motion for Summary Judgment

Xact filed a motion for summary judgment, in which it asserted both traditional and no-evidence grounds. Xact argued, *inter alia*, that there was no evidence that it asserted control over Robinson sufficient to assert liability over it on negligence grounds. As for its traditional motion for summary judgment, Xact argued that it was an agent of Momentum and was thus entitled to the protections of chapter 95. As evidence, Xact attached the same affidavits of Louie Michael Cure and Melvin Fesler that were attached to Momentum's motion for summary judgment, which are discussed above.

Xact also attached excerpts from the deposition of Robert Robinson, the president of GR Robinson Management, L.C., the managing general partner of Robinson Drilling of Texas, Ltd., which had contracted with Momentum to perform the drilling operations at the well. Mr. Robinson

testified that Robinson Drilling had no contract with Xact. Mr. Robinson also testified that he did not expect any of Xact's employees or consultants, including Fesler, to train or supervise his company's employees. Mr. Robinson further testified that he did not expect Xact to have any role in laying the blowout preventer down on the date of the accident.

Xact attached the deposition of Henry Renbarger, an employee of Robinson. Renbarger instructed Tony Painter,[6] the driller, to lay down the blowout preventer. Renbarger testified that Tony Painter's role with regard to laying down the blowout preventer was to supervise the crew.

Appellant Painter argued in response that, pursuant to the terms of the contract between Momentum and Robinson, Momentum exerted control of daywork operations, and that Xact was liable by virtue of having undertaken Momentum's obligations under the contract. Painter also argued that Xact, through Fesler, exerted actual control over Robinson's drilling operations, including the laying down of the blowout preventer. Finally, Painter argued that Xact had actual knowledge of the danger and failed to warn him.

### 1. Applicability of Chapter 95

On appeal, Painter argues that chapter 95 is not applicable to Xact, because Xact is not a property owner. As noted above, the chapter defines a "property owner" as "a person or entity that owns real property primarily used for commercial or business purposes." TEX. CIV. PRAC. & REM. CODE ANN. § 95.001(3). Section 95.002 deals with the applicability of the chapter and provides that it applies to a claim "against a property owner, contractor, or subcontractor for personal injury, death, or property damage to an owner, a contractor, or a subcontractor or an employee of a contractor or subcontractor . . . ." TEX. CIV. PRAC. & REM. CODE ANN. § 95.002(1). However, section 95.003, which deals with exemption from liability for acts of independent contractors, only refers to a

---

[6] Tony Painter is the father of Appellant Dusty Ray Painter.

property owner, and not to contractors, subcontractors, or any other persons or entities. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 95.003.

Xact nevertheless contends that section 95.003 also applies to a subcontractor. Xact relies on *Fisher v. Lee & Chang P'ship*. In *Fisher*, the employee of an independent contractor hired to make repairs at a retail store fell from a ladder and subsequently brought suit against the property owner and the property managers. 16 S.W.3d at 200. The First Court of Appeals held that chapter 95 applied to the claim against the property managers. *Id.* at 203. The court explained that the plaintiff alleged that the property managers were "agents, representatives, or employees" of the owner. *Id.* The court concluded that "sec. 95.003 applies to property owners and also to their agents who oversee their properties." *Id.*; *see also Padron v. L & M Props.*, No. 11-02-00151-CV, 2003 WL 253927, at *3 (Tex. App.--Eastland Feb. 6, 2003, no pet.) (applying chapter 95 to property management company); *Nagle v. GOM Shelf, L.L.C.*, No. Civ. A. V-03-103, 2005 WL 1515439, at *4 (S.D. Tex. June 24, 2005) (holding that manager who was agent of owner was entitled to protections of chapter 95).

The Master Service Agreement between Momentum and Xact provides in pertinent part:

WHEREAS, in the absence of the execution of a formal written contract for each project, the parties hereto desire to agree upon and enter into a contract which will set forth the terms and conditions under which all work will be performed by Contractor for Company and which will be applicable to all projects irrespective of the formality or informality which Contractor is retained.

. . .

Independent Contractor. Nothing contained in this Agreement shall be construed to constitute Contractor . . . as a partner, employee, agent or "borrowed servant" of the Company . . . nor shall either party have any authority to bind the other in any respect.

"A question of agency is generally one of fact, and one may be an independent contractor under some circumstances yet may be an agent or employee in connection with other work or activities." *Lyons v. Lindsey Morden Claims Mgmt., Inc.*, 985 S.W.2d 86, 90 (Tex. App.--El Paso 1998, no pet.); *see also Coleman v. Klöckner & Co. AG*, 180 S.W.3d 577, 587 (Tex. App.--Houston [14th Dist.] 2005, no pet.) ("[t]he question of whether an agency relationship exists is generally a question of fact"). Although the Master Services Agreement does not necessarily preclude the existence of an agency relationship at some point during the drilling operation, Xact has not shown that there is no fact issue on this question. Nor does Xact cite any authority extending the protections of chapter 95 to an independent contractor. *See Arsement v. Spinnaker Exploration Co.*, 400 F.3d 238, 251 (5th Cir. 2005) (stating that chapter 95 applies to the property owner, but not to general or independent contractors). Chapter 95 does not, in our opinion, apply to the negligence claims against Xact.

### 2. Xact's Right of Control

In support of his argument concerning contractual control, Painter points to the following provisions of the contract between Momentum and Robinson:

> Notwithstanding that this is a Footage Basis contract, Contractor and Operator recognize that certain portions of the operations as hereinafter designated, both above and below Contract Footage Depth, will be performed on a Daywork Basis. For purposes hereof, the term "Daywork" or "Daywork Basis" means Contractor shall furnish equipment, labor, and perform services as herein provided, for a specified sum per day under the direction, supervision and control of Operator (inclusive of any employee, agent, consultant or subcontractor engaged by Operator to direct drilling operations). When operating on a Daywork Basis, Contractor shall be fully paid at the applicable rates of payment and assumes only the obligations and liabilities stated herein as being applicable during Daywork operations. Except for such obligations and liabilities specifically assumed by Contractor, Operator shall be solely responsible and assumes liability for all consequences of operations by both parties while on a Daywork Basis, including results and all other risks or liabilities incurred in or incident to such operations.

Contractor will preassemble, disassemble, or assemble materials to be furnished by Operator only when directed by Operator and when such work can be accomplished by normal rig personnel. All of such services shall be performed on a Daywork Basis. Operator shall release Contractor from, and shall protect, defend and indemnify Contractor from and against any liability for such service.

Painter argued in his response and on appeal that the foregoing provisions vested Momentum and Xact, as its representative, with the right to control the details of the work done by Robinson. However, section 20.1 of the Drilling Contract provides:

In the performance of the work herein contemplated, Contractor is an Independent Contractor, with the authority to control and direct the performance of the details of the work, Operator being only interested in the results obtained. The work shall meet the approval of Operator and be subject to the right of inspection and supervision herein provided. Operator shall not unreasonably withhold approval of all such work, when performed by Contractor in accordance with the generally accepted practices and methods customary in the Industry. Contractor agrees to comply with all laws, rules, and regulations, Federal, State, and Local, which are now, or may in the future become applicable to Contractor, Contractor's business, equipment, and personnel engaged in operations covered by this Contract or accruing out of the performance of such operations; provided, however, as between Operator and Contractor specific provisions herein contained respecting the risk and responsibility for such compliance shall be controlling.

Xact argues that, while it was engaged by Momentum to monitor certain aspects of the drilling and casing of the well, there was no evidence that Momentum engaged Xact to control the operative details of the dismantling of the drilling rig or that Xact substituted its performance for that of Momentum. Xact further argues that the Contract itself only gives Momentum broad, supervisory powers over the daywork operations, not the right to control the operative details of such work.[7]

The duty to keep the premises in a safe condition may impose liability on a general contractor for negligence in two circumstances: (1) those arising from a premises defect and (2) those arising from an activity or instrumentality. *Redinger v. Living, Inc.*, 689 S.W.2d 415, 417 (Tex. 1985). This

---

[7] Appellants also argue that Xact is contractually liable to Appellants by virtue of the terms of the Drilling Contract. However, as noted above, Appellants did not assert a contract claim against Momentum or Xact.

is a negligent activity case. *See Coastal Marine Serv., Inc. v. Lawrence*, 988 S.W.2d 223, 225-26 (Tex. 1999). A general contractor ordinarily does not owe a duty to ensure that an independent contractor performs its work in a safe manner. *Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 783 (Tex. 2001); *Elliott-Williams Co. v. Diaz*, 9 S.W.3d 801, 803 (Tex. 1999). However, a duty may arise if the general contractor "retains some control over the manner in which the independent contractor performs its work." *Harrison*, 70 S.W.3d at 783.

Texas has adopted section 414 of the Restatement (Second) of Torts. *See Redinger*, 689 S.W.2d at 418; *Koch Refining Co. v. Chapa*, 11 S.W.3d 153, 155 (Tex. 1999). Section 414 provides:

> One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.

RESTATEMENT (SECOND) OF TORTS § 414 (1977). The comments to section 414 explain that:

> In order for the rule stated in this Section to apply, the employer must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way.

*Id.* at § 414 cmt. c; *see also Chi Energy*, 156 S.W.3d at 880 (degree of control retained must be more than a general right to order the work stopped or resumed, inspect its progress or to receive reports, make suggestions or recommendations which need not necessarily be followed, or prescribe alterations and deviations); *Bell v. VPSI, Inc.*, 205 S.W.3d 706, 719 (Tex. App.--Fort Worth 2006, no pet.) ("The retained right of control must extend to the operative details of the contractor's work so that he is not free to do the work in his own way."); *Perez v. Embree Constr. Group, Inc.*, 228

S.W.3d 875, 881 (Tex. App.--Austin 2007, pet. denied) ("a limited duty arises if a general contractor retains control over a subcontractor's methods of work or operative details, so that the subcontractor is not entirely free to do the work in his own way").

No evidence was produced as to any contract between Momentum and Xact that provided Xact with control over the operative details of Robinson's work at the well site. The Master Service Agreement contains no such provision, and there was no contract between Xact and Robinson.

Painter relies exclusively on the Drilling Contract between Momentum and Robinson. He argues that section 20.1 of the Drilling Contract applies only to work done on a footage basis, and not to work done on a daywork basis. However, section 20.1 applies to "the work herein contemplated" and is not, by its terms, limited to footage work. We conclude that, even assuming the Drilling Contract could be applied to Xact, a non-party, the Drilling Contract did not vest Xact with the right to control the operative details of Robinson's disassembly of the rig.

Painter also argues that Xact retained actual control over the drilling operations. Painter points to his summary judgment evidence concerning Xact's billing records and deposition testimony concerning Fesler's role as a company man. The billing records indicate that Xact charged Momentum for "Professional Consulting Services for Momentum Energy Corp. Wellsite Supervision undertaken on the Lindsey No. 1 well, Upton Co., Texas. By: Melvin Fesler." The invoices show that Xact charged Momentum for getting the casing ready, running casing, and cementing the casing.

Painter also submitted deposition testimony concerning Fesler's role at the well site. Fesler testified that "[a] company man is sent out there to see that everything is done according to the API standards for running casing . . . . While they're on day-work, they are out there to see that everything is done according to their specs." Fesler further testified that the company man is "the one that went out there and made sure that the casing was right, everything went right, everything

was in place, and everything was run at the right place and everything, and everything was done right." In his deposition, Robert Robinson agreed when asked that the company man had the ultimate say-so about the operation. Robinson also agreed that the company man had the right and responsibility to dictate the manner and means of the completion procedures with regard to the rig. Henry Renbarger, a Robinson employee, agreed when asked at his deposition whether the company man was the "captain of that team." Finally, Appellants point to the deposition testimony, discussed above, that, prior to the accident, Fesler directed Robinson crew members to stand out of the way while the crew was removing and laying down casing. However, none of the foregoing testimony indicates that Fesler gave Robinson any instruction over the operative details of laying down of the blowout preventer and the rotating head. In fact, it is undisputed that Fesler had walked away from the rig prior to the time of the accident. Accordingly, we conclude that no evidence was produced to show that Xact exercised actual control over Robinson with regard to the activity that resulted in the accident. We overrule this issue.

### D. McGuire Industries' Motions for Summary Judgment

Painter asserted negligence and strict liability claims against McGuire. He alleged that McGuire failed to provide any warning or instruction on how to connect and remove the rotating head. Painter also alleged that McGuire designed and manufactured the rotating head without adequate safety devices in the form of a safety chain or other catch device to prevent the rotating head from falling. In addition, he asserted claims for breach of implied warranties of merchantability and fitness for a particular purpose. Painter appeals only the trial court's summary judgment

regarding his negligence and strict liability claims as they relate to McGuire's alleged failure to warn.[8]

McGuire brought both a traditional and a no-evidence motion for summary judgment. In its no-evidence motion, McGuire argued that it was not negligent, because there was no evidence that McGuire owed a duty to provide warnings or instructions with the rotating head concerning the number of bolts to be used during disassembly or any preferred procedure for laying down the blowout preventer stack. With regard to Painter's strict liability claim, McGuire argued that there was no evidence of a marketing defect, because it had no duty to warn of an open and obvious danger and there was no evidence that any warnings concerning removal of the rotating head were necessary.

### 1. McGuire's Summary Judgment Evidence

In its traditional motion for summary judgment, McGuire argued that it was entitled to summary judgment on Painter's strict-liability marketing claim, because the removal of the rotating head by tipping it over with only two bolts attached was an open and obvious danger. Similarly, McGuire argued that it was entitled to judgment on Painter's negligence claim, because it had no duty to warn or provide instructions as to obvious risks. As evidence, McGuire attached the deposition testimony of various employees of Robinson, including Painter, who testified that, as part of his duties, he had previously been engaged in hooking up or taking apart the rotating head. Painter also testified as follows:

> Q: Okay. Sitting here--and I think you said before, sitting here today you were unaware that there was ever any discussions at all about bolts being removed in any way, correct?

---

[8] In his summary judgment response, Painter addressed only his claims that related to McGuire's alleged failure to warn or instruct.

A: Yes, sir.

Q: Okay. Had anybody ever told you that any of those bolts had simply been backed out? In other words, not completely removed but perhaps removed most of the way or partially and then maybe made hand tight?

A: No, sir.

Q: If the bolts securing the rotating head to the BOP were just hand tight, that wouldn't be right, correct?

MR. KERBY: Objection, form.

A: Correct.

Q: (BY MR. ECHOLS) That would be an incorrect procedure?

A: Yes, sir.

McGuire also attached the deposition testimony of Tony Painter, the driller on Appellant Painter's shift. Mr. Painter testified that he was only able to use four to six holes in the blowout preventer to which he was to attach the rotating head, because the threads were "messed up" or full of cement. He further testified that he had additional bolts, but was unable to use them, because he "didn't have the holes" in the blowout preventer to screw them down. Mr. Painter testified that he had reported the problem, but Robinson had taken no action to his knowledge. He testified that he had been told that there were two bolts remaining in the rotating head before the accident. Mr. Painter further testified that he had laid a blowout preventer and rotating head over with only two bolts in the past. He agreed that having as many bolts in as possible would be a safer procedure, but testified that "it would have took me that much longer when I got it laying down to take them bolts out."

McGuire also attached portions of the deposition of Renbarger, an employee of Robinson, who worked as a toolpusher during the time of the accident. Renbarger testified that the method

used to lay down the blowout preventer stack the day of the accident was a common occurrence on an oil well. Renbarger also testified as follows:

> Q: Is the reason that you would have frowned upon that and the reason that you believe that would be stupid is because it's common sense that the more bolts you have in place securing the rotating head to the BOP, the safer it is to lay down the BOP stack?
>
> MR. THOMPSON: Form.
>
> A: Well, yes. Just like it's common sense that you don't want to take them out because it will fall off.
>
> MR. THOMPSON: Nonresponsive.
>
> Q: In other words, the best practice and the practice that you all followed was to make sure that there were sufficient bolts securing the rotating head to the BOP so that it would not fall off?
>
> A: Yes, sir.
>
> MR. THOMPSON: Form.
>
> Q: And it is--again, it's common sense that the more you have, the better, right?
>
> MR. THOMPSON: Form.
>
> A: Yes, sir.

Renbarger also testified that he did not need any warnings, that he did not expect that Tony Painter would have needed any warnings to know that there needed to be more studs securing the rotating head before the BOP stack was laid over, and that he knew this at the time.

McGuire attached excerpts from the deposition of William Ryan Locke, a Robinson employee, who was on the shift immediately prior to Painter's. Locke testified that he instructed his crew to remove two bolts of the four bolts securing the rotating head to the blowout preventer, because he was told to do so. Locke made sure that he could turn them by hand. Locke also testified:

Q: All right. Do you know whether or not there was any safer or preferred method of laying down--

A: Yes, should have taken the rotating head off.

MR. THOMPSON: Form.

.   .   .

Q: All right. At what point in time did you come up, then, with your understanding that it's more appropriate to take the rotating head off first?

MR. THOMPSON: Form.

A: I think the first time I ever did it and then when the accident happened.

Also attached to McGuire's motion were excerpts from the deposition of Daniel Nunn, a Robinson employee at the time of the accident. Nunn testified that Locke told him to remove two of the four bolts securing the rotating head and to leave the remaining bolts hand- tightened. Nunn told Locke that he would have taken the whole thing off. Nunn further testified:

Q: What exactly did you tell Mr. Locke?

A: I told him, "This is bullshit."

Q: Okay.

A. "I wouldn't do it like that."

Q: Okay. When you say, "This is bullshit," did you tell him what was bullshit?

A: Yeah.

Q: Tell me as best you can remember the exact words you used when you told him.

A: I can't remember that great.

Q: Okay. Well, tell me best you can remember. What did you tell him?

A: Just told him that we shouldn't do it that way.

Q: Shouldn't do what--

A: It should be taken off and sat on the ground before you ever lay your stack over.

McGuire attached the deposition of Robert Robinson, who testified that his company's verbal procedure with respect to a blowout preventer and a rotating head was to "unbolt it and take it off and lay it on the ground." Mr. Robinson also testified as follows:

Q: Would there be any reason to take out all but two of the bolts on a rotating head and then begin to lay it down?

MR. THOMPSON: Form.

A: No, I don't see why.

Q: Did y'all have any procedure in place where that would have been an appropriate action, take all but two bolts out and then begin to lay the vertical assembly down?

MR. THOMPSON: Form.

A: No.

## 2. Painter's Summary Judgment Evidence

In his summary-judgment response, Painter argued that the danger relating to the rotating head was not open and obvious, because Robinson had used the method of tipping over the blowout preventer and rotating head whenever it removed a rotating head and that McGuire failed to warn or instruct as to the proper procedure to remove the rotating head, which, according to Weldon McGuire, was to remove the rotating head from the blowout preventer stack while the blowout preventer was upright.

Painter attached portions of the deposition of Weldon McGuire. Mr. McGuire stated that the portion of the rotating head that fell during the accident weighed approximately 1,500 pounds. McGuire did not provide any instructions or warnings with the rotating head, nor did McGuire rent bolts to Momentum for the rotating head. Mr. McGuire also testified that, when his company rents out a complete blowout stack, including the rotating head, its normal procedure was to have a man

on location at the rate of $55 per hour to see that the stack is put together properly. However, Mcguire does not provide someone to supervise assembly when only a rotating head is rented. McGuire sends a company representative to supervise disassembly of a complete stack when requested. Mr. McGuire also testified that, when the rotating head is removed from the blowout preventer, it is usually unbolted, lifted off, and set on the ground and that this was necessary to disassemble the head safely. When assembling the blowout preventer, McGuire's supervisor is instructed to use all twenty bolts when attaching the rotating head to the blowout preventer.

Painter also attached portions of the deposition of Henry Renbarger. Renbarger did not recall any instructions or warnings concerning how many bolts should be attached to the rotating head. Renbarger also testified that, if McGuire had provided a warning as to the number of bolts to use in attaching the rotating head, he would have followed it. Painter also pointed to deposition testimony by Tony Painter and William Locke indicating that the method used the day of the accident to disassemble the blowout preventer stack was the method that Robinson used to remove the stack.

### 3. Painter's Strict Liability Claim

On appeal, Painter argues that its summary judgment evidence and the reasonable inferences therefrom showed that McGuire was aware of the risk of harm from improperly assembling and disassembling the rotating head and that McGuire failed to give proper warnings or instructions concerning assembly and disassembly.

Texas has adopted the theory of strict products liability expressed in section 402A of the Restatement (Second) of Torts. *Caterpillar, Inc. v. Shears*, 911 S.W.2d 379, 381 (Tex. 1995) (citing *McKisson v. Sales Affiliates, Inc.*, 416 S.W.2d 787, 788-89 (Tex. 1967)). "A defendant's failure to warn of a product's potential dangers when warnings are required is a type of marketing defect." *American Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 426 (Tex. 1997). The elements of a marketing defect claim are: (1) a risk of harm that is inherent in the product or that may arise from the intended or reasonably anticipated use of the product; (2) the supplier of the product knows or reasonably should foresee the risk of harm at the time the product is marketed; (3) the product has a marketing defect; (4) the lack of warnings or instructions renders the product unreasonably dangerous to the ultimate user or consumer; and (5) the failure to warn or instruct causes the user's injury. *Ranger Conveying & Supply Co. v. Davis*, 254 S.W.3d 471, 480 (Tex. App.--Houston [1st Dist.] 2007, pet. denied); *Goodyear Tire & Rubber Co. v. Rios*, 143 S.W.3d 107, 116 (Tex. App.--San Antonio 2004, pet. denied).

There is, however, no duty to warn when a product's risks are within the ordinary common knowledge of the community. *Joseph E. Seagram & Sons, Inc. v. McGuire*, 814 S.W.2d 385, 388 (Tex. 1991). In addition, the law of products liability does not require a manufacturer or distributor to warn of obvious risks. *Caterpillar*, 911 S.W.2d at 382; *see also Grinnell*, 951 S.W.2d at 426; *Lozano v. H.D. Indus., Inc.*, 953 S.W.2d 304, 314 (Tex. App.--El Paso 1997, no pet.) ("A party has

no duty to warn of obvious risks, since a readily apparent danger serves the same function as a warning."); *Hanus v. Texas Utils. Co.*, 71 S.W.3d 874, 880 (Tex. App.--Fort Worth 2002, no pet.) ("a manufacturer has no duty to warn of obvious risks because a readily apparent danger serves the same function as a warning"); *Roland v. DaimlerChrysler Corp.*, 33 S.W.3d 468, 469 (Tex. App.--Austin 2000, pet. denied) ("In Texas, a manufacturer has no duty to warn of open and obvious dangers."). Thus, there is only a duty to warn or instruct concerning risks of which the consumer is unaware. *Caterpillar*, 911 S.W.2d at 382. "The consumer's perspective is that of an ordinary user of the product, not necessarily the same as that of an ordinary person unfamiliar with the product." *Sauder Custom Fabrication, Inc. v. Boyd*, 967 S.W.2d 349, 351 (Tex. 1998). Moreover, "[w]hen the foreseeable users of a product have special training, a supplier has no duty to warn of risks that should be obvious to them, even if persons without such training would not appreciate the risks." *Humble Sand & Gravel, Inc. v. Gomez*, 146 S.W.3d 170, 183 (Tex. 2004).

The question of whether a duty exists to warn of the dangers or instruct as to the proper use of a product is a question of law. *Seagram & Sons*, 814 S.W.2d at 387; *Grinnell*, 951 S.W.2d at 426. Likewise, "[w]hether a danger is open and obvious as a matter of law is an objective question for the court to determine." *Lozano*, 953 S.W.2d at 314.

Painter argues that a fact issue exists as to whether the danger relating to the rotating head was open and obvious. Specifically, Painter argues that Robinson's standard procedure for disassembling the rotating head was to lay down the blowout preventer stack and to leave two bolts hand-tight in the rotating head, when doing so. Painter further argues that McGuire did not produce any evidence that Robinson had ever had a rotating head fall before when following this procedure.

In *Caterpillar*, the plaintiff, Shears, suffered injuries while operating a front-end loader, when he was struck by another loader. *Caterpillar*, 911 S.W.2d at 381. Shears brought strict-liability and

negligence claims against the manufacturer of the loader for failing to warn him of the hazards of operating a loader without a rollover protective structure ("ROPS"). *Id.* at 380. The evidence showed that Shears was an experienced operator of heavy equipment. Shears testified that he had seen machinery equipped with a ROPS, but he thought it was to protect the operator from the weather and had no idea of the risks of operating a front-end loader without a ROPS. *Id.* at 383. The Supreme Court held that Caterpillar did not, as a matter of law, have a duty to warn. *Id.* That Shears was an experienced heavy equipment operator who had apparently never been injured by virtue of operating a loader without ROPS did not preclude a finding that the danger of collision was obvious. Similarly, the fact that Robinson had previously removed the blowout preventer stack by tipping it over does not preclude a determination that the risks involved in tipping over a rotating head secured by two hand-tight bolts were obvious. As discussed above, the question of whether a risk is open and obvious is an objective one. *Lozano*, 953 S.W.2d at 314.

The evidence is undisputed that the rotating head was secured by no more than two hand-tight bolts at the time the drilling crew attempted to tip over the blowout preventer stack. The evidence is also undisputed that the portion of the rotating head that struck Appellants weighed approximately 1,500 pounds. We conclude that the dangers of an object of that weight, secured only by two hand-tight bolts, falling when tipped over from the top of a drilling rig are open and obvious. *See Hanus*, 71 S.W.3d at 880 (affirming summary judgment on marketing claim, because danger from digging into buried power lines was both obvious and commonly known); *Ritz Car Wash, Inc. v. Kastis*, 976 S.W.2d 812, 814 (Tex. App.--Houston [1st Dist.] 1998, pet. denied) (mechanic with over forty years' experience, who was burned while draining gasoline from gas tank, could not prevail on marketing defect claim, because flammability of gasoline was obvious); *Coleman v. Cintas Sales Corp.*, 100 S.W.3d 384, 386 (Tex. App.--San Antonio 2002, pet. denied) (holding, as

a matter of law, that it is commonly known that non-flame retardant clothing will burn if exposed to a flame).  We overrule this issue.

### 4.  Painter's Negligence Claim

Painter's negligence claim was also based on McGuire's alleged failure to warn and instruct. On appeal, Painter makes the same arguments that he makes with regard to his marketing claim.  The elements of a claim for negligence are the existence of a duty, breach of that duty, and damages proximately caused by that breach.  *Garcia v. El Paso Ltd. P'ship*, 203 S.W.3d 432, 435-36 (Tex. App.--El Paso 2006, no pet.).

In the context of Painter's claim, the threshold question is whether McGuire owed a legal duty to warn of the alleged danger associated with the rotating head.  *See Morgan v. Wal-Mart Stores, Inc.*, 30 S.W.3d 455, 461 (Tex. App.--Austin 2000, pet. denied).  Whether a duty exists is a question of law for the court.  *Garcia*, 203 S.W.3d at 436.  Because we have already concluded that McGuire did not have a duty to warn with regard to Painter's strict-liability claim, we hold that McGuire is not liable under Painter's negligent failure to warn claim.  *See Sauder*, 967 S.W.2d at 351 (refusing to allow recovery on either products-liability or negligent failure-to-warn claims, when risk was obvious to average consumer).  We overrule this issue.

## III. CONCLUSION

The judgment of the trial court is affirmed.

KENNETH R. CARR, Justice

November 20, 2008

Before Chew, C.J., McClure, and Carr, JJ.