COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS


| | | |
|---|---|---|
| JOHN BARFIELD AND TANA BARFIELD, WIFE, INDIVIDUALLY, AND JOHN BARFIELD AND TANA BARFIELD AS NEXT FRIENDS OF C. B. AND K. B., MINOR CHILDREN, | § § § § | No. 08-17-00059-CV Appeal from the 109th District Court |
| Appellants, | § | of Andrews County, Texas |
| v. | § | (TC# 19145) |
| SANDRIDGE ENERGY, INC., AND JOSE "PEPE" SAENZ, | § | |
| Appellees. | | |

## OPINION ON REHEARING

We previously issued our Opinion on December 6, 2019. Appellees SandRidge Energy, Inc. (SandRidge) and Jose "Pepe" Saenz jointly filed a motion for rehearing on January 13, 2020. After reviewing the motion for rehearing and response thereto, we grant the motion for rehearing, in part, and deny the remainder. We withdraw our Opinion and Judgment issued on December 6, 2019 and issue the following Opinion on Rehearing.

In this case of premises liability, Appellants John Barfield [1] and Tana Barfield (collectively, Barfield) challenge the trial court's order granting summary judgment in favor of

---

[1] Appellant John Barfield seeks personal injury damages while his wife Tana Barfield seeks related consortium

SandRidge Energy, Inc. (SandRidge) and Jose "Pepe" Saenz. By his suit, Barfield alleged he was electrocuted while working for an independent contractor on an improvement located on property owned and controlled by SandRidge. On appeal, Barfield argues that he carried his burden to produce evidence raising genuine issues of material fact precluding judgment as a matter of law on the statutory elements required to impose liability on SandRidge, a property owner, pursuant to chapter 95 of the Texas Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 95.001 - .004. As to Saenz, however, Barfield concedes the validity of the trial court's summary judgment in his favor even though he initially challenged that ruling on appeal.

We affirm in part, and reverse and remand in part.

## BACKGROUND[2]

On the occasion in question, SandRidge operated oil and gas leases in Andrews County, Texas, as an energy-production company. Additional to owning property and improvements thereon, SandRidge owned the substation and distribution lines on its property which provided electrical power to its operations. SandRidge hired OTI Electrical Services, LLC (OTI), to modify a series of distribution lines attached to electrical poles on the property. Barfield worked as a lineman employed by OTI.

Pursuant to a master services agreement, OTI performed electrical work for SandRidge that generally involved the building of power lines to support new wells drilled on its property. Barfield was assigned to work on the lease known as the SandRidge Miles Terry Steven #10

---

damages. Together they also file derivative claims on behalf of their children. To simplify our discussion, we will refer to all plaintiff claims collectively as claims of Barfield unless further detail is warranted.

[2] Unless otherwise noted, the facts cited are taken from the summary judgment record.

located on a portion of property referred to as the Arena Field. For SandRidge, electrical engineer Jose "Pepe" Saenz was assigned to supervise the work of Barfield and the other OTI crewmembers working in the field.

On January 11, 2012, Barfield was performing electrical work that included modifications to a distribution line that supplied electrical power to a series of wells when he sustained an injury that caused severe burns to his body. Barfield was working high above ground in a bucket—performing his work within four feet or so of an energized distribution line—removing "hot taps" to de-energize transformers. In his live pleading, Barfield alleged he sustained an electrical shock that rendered him unconscious and caused burns to both arms that were so severe that his left arm was amputated at the shoulder and his right arm was amputated at his forearm. Barfield alleged these injuries occurred because SandRidge and Saenz had "imposed a procedure on OTI to work on the energized end-bank pole of the distribution line which supplied power to pump jacks on the well site." Barfield claimed that SandRidge and Saenz would not "de-energize" their lines before electrical work was performed. Instead, he alleged, that SandRidge and Saenz required OTI and its employees to work on and around a live energy source in direct contravention of the safe work practices and regulatory requirements applicable not only to SandRidge's own employees but also to employees of its contractors. Barfield claimed he was informed "that 'de-energizing' the line would take multiple wells offline until the work was completed with resultant loss of production." Barfield alleged his injuries were caused by the negligence of both SandRidge and Saenz individually. Invoking chapter 95 of the Texas Civil Practice and Remedies Code, Barfield asserted that SandRidge was liable for personal injuries based on the facts alleged given that SandRidge exercised control over the manner in which his work was performed on its property,

3

that it had actual knowledge of a danger or condition existing on the property, and that it failed to adequately warn him of the same. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 95.003.

Responding to Barfield's suit, both SandRidge and Saenz generally denied Barfield's allegations while additionally asserting several affirmative defenses. Among defenses, both defendants asserted that Barfield's action against them failed pursuant to section 95.003 of the Texas Civil Practice and Remedies Code. *See id.* § 95.003. Based on proportionate responsibility, SandRidge and Saenz additionally asserted that Barfield's own negligence was the proximate cause of the occurrence in question and resulting damages. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 33.001-.003.

Following a period of discovery, SandRidge and Saenz jointly filed a hybrid motion for summary judgment combining both traditional and no-evidence grounds pursuant to the Texas Rules of Civil Procedure. *See* TEX. R. CIV. P. 166a(c) and (i). Pursuant to chapter 95, SandRidge argued it was entitled to judgment as a matter of law based on four grounds. First, that SandRidge did not owe a duty to warn Barfield or his employer about the allegedly dangerous condition on its premises (i.e. the presence of energized lines at the poles where Barfield was working as an independent contractor) because the evidence conclusively established that Barfield and OTI knew about this condition. Second, even if SandRidge owed a duty to warn Barfield about the energized poles, the evidence conclusively established that SandRidge did not fail to adequately warn Barfield of this condition as he admitted that he and OTI knew they were working on energized poles. Third, that SandRidge did not have actual knowledge of any other allegedly dangerous condition on its premises that may have resulted in Barfield's injuries, to wit: that the maximum voltage in the lines was higher than expected due to the structure of the poles. Fourth, that

4

SandRidge did not exercise or retain control over the manner in which Barfield or OTI performed their work.

Independent of SandRidge, Saenz argued that he was entitled to judgment as a matter of law because he was acting solely within the scope of his employment. Moreover, Saenz asserted he did not owe a duty to Barfield given that he did not own or control the premises at issue, nor did he engage in any contemporaneous activity that caused Barfield's injury. Both SandRidge and Saenz included summary judgment evidence in support of their motions to include the master services agreement between SandRidge and OTI, certain documents produced in discovery, and testimony from witnesses who were deposed.

Responding with his own evidence, Barfield asserted he raised issues of fact precluding judgment as a matter of law as to the statutory elements required by chapter 95 to impose liability upon SandRidge, under limited conditions, for an alleged failure to provide a safe workplace. In its entirety, however, Barfield's response focused solely on the liability of SandRidge without contesting Saenz' independent assertion that he owed no duty of care to Barfield given he had merely worked as an employee of SandRidge.

By written order, the trial court granted the motions for summary judgment of both SandRidge and Saenz without providing explanation. Subsequently, Barfield filed a motion for reconsideration and a motion for new trial, which the trial court later denied. Thereafter, Barfield filed a timely appeal of the trial court's order.

## DISCUSSION

On appeal, Barfield raises two issues challenging the trial court's grant of summary judgment in favor of SandRidge. Simultaneously, however, he abandons the related challenge he

5

asserted against the judgment granted in favor of Saenz.[3] Barfield seeks reversal of the trial court's grant of summary judgment on the basis that SandRidge owed a duty to make its premises safe given that (1) SandRidge had actual knowledge of the hazard of Barfield's necessary work in close proximity to energized power lines, (2) SandRidge failed to adequately warn, and (3) SandRidge exercised "some control" over how Barfield and OTI performed their work. Barfield essentially argues he met the evidentiary burden of chapter 95 to raise issues of fact on whether the limited conditions of the statute were satisfied to impose liability on SandRidge for an alleged failure to make its premises safe. Being that both issues are intertwined with statutory requirements, we consider them together for brevity.

### *Standard of Review*

We review a trial court's summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005); *Chappell v. Allen*, 414 S.W.3d 316, 322 (Tex. App.—El Paso 2013, no pet.). A party seeking summary judgment may move for both a traditional and a no-evidence summary judgment. *Binur v. Jacobo*, 135 S.W.3d 646, 650 (Tex. 2004); *see* TEX. R. CIV. P. 166a(c), (i). When a party has sought summary judgment on both grounds, we typically review the propriety of the summary judgment under the no-evidence standard first. *See Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013). We review no-evidence motions under the same legal sufficiency standard as a directed verdict. *Id*. Under this standard, the nonmovant has the burden to produce more than a scintilla of evidence to support each challenged element of its claims. *Id.*

---

[3] In the conclusion of his brief, Barfield plainly states that he "did not contest the issue of whether Saenz owed Barfield an independent duty in the trial court, so [he] concedes the propriety of the summary judgment as to Saenz."

In a traditional motion, the movant has the burden to show there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c). *Lightning Oil Co. v. Anadarko E&P Onshore, LLC*, 520 S.W.3d 39, 45 (Tex. 2017). A defendant is entitled to summary judgment if it conclusively negates at least one essential element of the cause of action asserted against it by the plaintiff. *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508 (Tex. 2010). A matter is conclusively established if reasonable people could not differ as to the conclusions to be drawn from the evidence. *See City of Keller v. Wilson*, 168 S.W.3d 802, 816 (Tex. 2005). If the movant meets its burden, the burden then shifts to the nonmovant to raise a genuine issue of material fact precluding judgment as a matter of law. *See Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995).

In reviewing either type of summary judgment motion, we view the evidence "in the light most favorable to the nonmovant, crediting evidence a reasonable jury could credit and disregarding contrary evidence and inferences unless a reasonable jury could not." *Merriman*, 407 S.W.3d at 248. Where the summary judgment order fails to specify the grounds upon which the trial court relied for its ruling, we may affirm the judgment if any of the grounds advanced are meritorious. *Vasquez v. S. Tire Mart, LLC*, 393 S.W.3d 814, 817 (Tex. App.—El Paso 2012, no pet.). With its hybrid motion, SandRidge argued it owed no duty to Barfield to provide a safe workplace based upon the liability protection afforded to a property owner by chapter 95 of the Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 95.003. In countering, Barfield argued it met the evidentiary burden required of chapter 95 for an exception to liability protection to apply to the circumstances. Because SandRidge and Barfield essentially relied on the same evidence for each motion type, we follow suit.

7

**Liability pursuant to Chapter 95**

We begin with the parties' general agreement that chapter 95 of the Civil Practice and Remedies Code governs this negligence suit based on premises liability. *See id.* §§ 95.002, 95.003. First, section 95.002 limits the chapter's application to certain prescribed claims. *Id.* § 95.002. For the chapter to apply, the claim must be filed "(1) against a property owner, contractor, or subcontractor for personal injury, death, or property damage to an owner, a contractor, or a subcontractor or an employee of a contractor or subcontractor; and (2) that arises from the condition or use of an improvement to real property where the contractor or subcontractor constructs, repairs, renovates, or modifies the improvement." *Id.* § 95.002. Second, when applicable to the circumstances, a claimant must satisfy two conditions to impose liability on a property owner for failing to provide a safe workplace. *Id.* § 95.003. To impose liability, the claimant must establish that: "(1) the property owner exercise[d] or retain[ed] some control over the manner in which the work [was] performed, other than the right to order the work to start or stop or to inspect progress or receive reports; and (2) the property owner had actual knowledge of the danger or condition resulting in the personal injury, death, or property damage and failed to adequately warn." *Id.* § 95.003.

In short, chapter 95 relates to limitations on a property owner's liability for injury, death, or property damage, to employees of independent contractors and other named parties, when such injury or damage arises from constructing, repairing, renovating, or modifying, an improvement to real property. *Abutahoun v. Dow Chem. Co.*, 463 S.W.3d 42, 43 (Tex. 2015). Construing chapter 95, the Texas Supreme Court described sections 95.002 and 95.003, respectively, as being "the heart of the chapter." *Abutahoun*, 463 S.W.3d at 46 (citing Tex. Civ. Prac. & Rem. Code

8

ANN. §§ 95.002 and .003). Thus, *Abutahoun* observed that when conditions of section 95.002 are satisfied, a claimant's sole means of recovery requires satisfaction of both prongs of section 95.003. *Id.* at 51.

Here, the parties readily agree that the evidence established that chapter 95 applies to Barfield's claim. *See id*. § 95.002. First, there is no dispute that SandRidge was the owner of the improvements on which Barfield worked at the time he sustained his injuries. The evidence established that SandRidge owned and controlled the distribution line, poles, substation, and worksite where Barfield worked. Second, the master services agreement established a contractual relationship between SandRidge and OTI and expressly provided that OTI was hired to work for SandRidge as an independent contractor. As an employee of OTI, Barfield performed work that modified the electrical poles and power lines located on SandRidge's property. Given these circumstances, the parties agree, and we so hold, that chapter 95 generally governs Barfield's claim of personal injury against SandRidge based on premises liability. *See* § 95.002(1) and (2); *see also Abutahoun,* 463 S.W.3d at 50–51; *Painter v. Momentum Energy Corp.*, 271 S.W.3d 388, 398 (Tex. App.—El Paso 2008, pet. denied) (chapter 95 applies to a premises-liability claim where the injury arises from work being done on an improvement).

Despite reaching agreement on applicability, however, the parties heavily dispute whether the summary judgment record conclusively established that SandRidge was protected from liability by the terms of the statute, or whether issues of material fact were raised by Barfield regarding the exception to such protection. *See id.* § 95.003. As stated earlier, a property owner is protected from liability when chapter 95 applies unless two distinct conditions are established: (1) that the property owner exercised or retained control over the manner in which the employee

9

performed his work; and (2) the property owner had actual knowledge of the danger or condition resulting in the injury and failed to adequately warn. *See id.* § 95.003(1) and (2). Here, Barfield asserts that he met the evidentiary burden required to raise issues of fact as to whether SandRidge could be held liable for damages arising from a failure to provide a safe workplace. *See id.* § 95.003. Countering, SandRidge contends there was no evidence that it exercised or retained control over the work performed by OTI or Barfield, and that it conclusively established that it owed no duty to warn Barfield given that OTI and Barfield actually knew about the dangerous condition on its property.

## A. Section 95.003's Control Requirement

Given the parties' dispute on liability, we begin with the first prong of the statute—the requirement of "some control." Barfield contends he raised a fact issue as to whether SandRidge had exercised or retained control over the manner of his work at the time he was injured. Section 95.003 requires that Barfield establish that SandRidge "exercise[d] or retain[ed] some control over the manner in which the work [was] performed, other than the right to order the work to start or stop or to inspect progress or receive reports[.]" *Id.* § 95.003(1).

Texas courts have interpreted the requirement of "some control" as codifying the Texas Supreme Court's holding in *Redinger v. Living, Inc.*, which adopted the rule enunciated in section 414 of the Restatement (Second) of Torts. *See Dyall v. Simpson Pasadena Paper Co.*, 152 S.W.3d 688, 699 (Tex. App.—Houston [14th Dist.] 2004, pet. denied) (citing *Redinger v. Living, Inc.,* 689 S.W.2d 415, 418 (Tex. 1985)); *see also Torres v. Chauncey Mansell & Mueller Supply Company*, 518 S.W.3d 481, 491-92 (Tex. App.—Amarillo 2017, pet. denied) ("This level of control is a mere iteration of the control required by our common law when one attempts to impose liability upon a

property owner for injuries suffered by a subcontractor."); *Hernandez v. Amistad Ready Mix, Inc.*, 513 S.W.3d 773, 776 (Tex. App.—San Antonio 2017, no pet.); *Garcia v. Apache Corp.*, No. 11-17-00077-CV, 2019 WL 613718, at *3 (Tex. App.—Eastland Feb. 14, 2019, no pet.) (mem. op.).

Applying the common law, *Redinger* adopted the standard that "[o]ne who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care." *Redinger*, 689 S.W.2d at 418. "This rule applies when the employer retains some control over the manner in which the independent contractor's work is performed[ ] but does not retain the degree of control which would subject him to liability as a master." *Id.* When a property owner exercises some control over a subcontractor's work, he or she may be liable under the common law unless reasonable care is exercised in supervising the subcontractor's activity. *Id.*

The type of control needed is more than a general right to order the work stopped or started, to inspect its progress or to receive reports, to make suggestions or recommendations which may be ignored, or to prescribe alterations and deviations in the work. *Fifth Club, Inc. v. Ramirez*, 196 S.W.3d 788, 791–92 (Tex. 2006) (citing *Koch Ref. Co. v. Chapa*, 11 S.W.3d 153, 155 (Tex. 1999)). The property owner becomes liable only if it controls the details or methods of the independent contractor's work to such an extent that the contractor is not entirely free to do the work in his own way. *Ramirez*, 196 S.W.3d at 792; *Chapa*, 11 S.W.3d at 155 (quoting Restatement (Second) of Torts § 414 cmt. c (1965)); *Painter*, 271 S.W.3d at 406 (citing *Bell v. VPSI, Inc.*, 205 S.W.3d 706, 719 (Tex. App.—Fort Worth 2006, no pet.) (the right of control must extend to the operative details of the subcontractor's work)). The retention of a right to control an aspect of an independent

11

contractor's work so as to give rise to a duty of care may be shown by either a contractual right or by the actual exercise of control. *Lee Lewis Const., Inc. v. Harrison*, 70 S.W.3d 778, 783 (Tex. 2001). The determination of what a contract says is generally a question of law for the court. *Id*. But a determination of whether a party exercised actual control is generally a question of fact for the jury. *Id.*

Here, Barfield asserts that more than a scintilla of evidence established that he and OTI were not free to perform their work entirely in their own way due to SandRidge exercising control over the detail of whether power lines in close proximity remained energized while they worked. Barfield contends that SandRidge's electrical inspector, Jose "Pepe" Saenz, required Barfield to perform his work in close proximity to the energized lines, otherwise known as performing "hot" work, despite written policies prohibiting such work except under narrowly defined circumstances that were not then applicable. Barfield further asserts that he and OTI requested that lines be de-energized, but Saenz refused.

As evidence, Barfield not only produced his own deposition, he also produced testimony from several other witnesses to include (1) Mike Lawson, his boss at OTI, (2) Jose "Pepe" Saenz, SandRidge's electrical supervisor assigned to supervise the area where Barfield worked, (3) Mark Sutherland, SandRidge's liability expert, and (4) Richard Sosa, SandRidge's Vice-President of Power Systems. Barfield also produced other discovery materials on which he relies to include applicable safety rules and practices of SandRidge, which OTI contractually agreed it would follow, as well as safety work practices of SandRidge which were then in effect and on which workers were trained.

12

On review, we note that Michael Lawson, owner of OTI, testified that everyone at OTI knew they were required to follow SandRidge's safety policies while working on leases and equipment of SandRidge. Indeed, the master services agreement provided that "[OTI] warrants that it will be subject to and cause [OTI's] employees, agents, representatives, subcontractors and others under [OTI's] control during the performance of the Work or in connection therewith to be subject to all applicable safety, health and environmental rules and all applicable provisions of national, state or local safety, health and environmental laws, rules, regulations or orders." Related to OTI's contractual obligation, Barfield included applicable safety practices of SandRidge on which he relies to meet his evidentiary burden. Relevant safety practices provided as follows:

7. Safety-related Work Practices

*Safety-related work practices must be employed to prevent electric shock or other injuries resulting from either direct or indirect electrical contacts when work is performed near or on equipment or circuits that are or may be energized.* The specific safety-related work practices, as it applies to the work at hand, must be consistent with the nature and extent of the associated potential electrical hazards.

7.1 De-energized Parts

A. *Live parts to which an individual may be exposed must be de-energized before the person works on or near them, unless it can be shown that de-energizing introduces additional or increased hazards, or is infeasible due to equipment design or operational limitations.*

B. All parts of electric equipment that have been de-energized but have not been locked out or tagged must be treated as energized parts.

7.2 Energized Parts

A. If the exposed live parts cannot be de-energized (i.e., for reasons of increased or additional hazards or infeasibility), other safety related work practices must be used to protect all personnel who may be exposed to the electrical hazards involved.

13

B. The work practices that are used must be suitable for the conditions under which the work is to be performed and for the voltage level of the exposed electrical conductors or circuit parts.

7.3 Electrical Lockout and Tagout Requirements

A. A lock and a tag shall be placed on each disconnecting means used to de-energize circuits and equipment on which work is to be performed. Procedures are available in the Lockout/Tagout Program.

7.4. Working on or Near Exposed Energized Parts

A. When personnel perform work on or near exposed live parts (involving either direct contact or contact by means of tools or materials) or near enough to them for employees to be exposed to the hazard they present, conductors and parts of electric equipment that have been de-energized but have not been locked out, shall be treated as energized.

. . .

7.6 Overhead Lines

A. *If work is to be performed near overhead lines, the lines must be de-energized and grounded or other protective measures must be provided before work is started.*

B. If other protective measures are used, such as guarding, isolating or insulating, these precautions shall prevent employees from contacting the lines directly with any part of their body or indirectly through conductive materials, tools or equipment and *must be communicated to all persons potentially exposed.*

(Emphasis added).

Lawson explained that OTI had received handbooks supplied by SandRidge that were provided to its crew. Lawson described the safety policies as being "pretty standard policies." Consistent with industry-wide practices, these policies generally discouraged performance of "hot work." Richard Sosa, a Vice-President of SandRidge, testified that the job would technically qualify as "hot work" because Barfield worked on a non-isolated circuit. Additional to Lawson,

14

SandRidge's liability expert, Mark Sutherland, also testified that SandRidge's safety policies required that the work be done de-energized in compliance with SandRidge's policies.

Despite these policies prohibiting work in close proximity to energized lines or other live equipment and parts—unless it could be shown that de-energizing introduced additional or increased hazards, or was infeasible due to equipment design or operational limitations—Barfield testified that SandRidge's on site supervisor, Jose "Pepe" Saenz, refused to authorize any de-energization in the area where he worked. While testifying about how his injury occurred, Barfield described that he was working up in a bucket, removing "hot taps," disconnecting fuses where necessary, and doing work within four feet or so of an energized distribution line. Barfield explained that hot taps are disconnected to alleviate electricity "going through the transformers and adding amperage." Barfield explained that disconnecting hot taps de-energizes the transformers but does not de-energize the pole itself nor the lines on the top cross bar. Barfield testified he recalled that he was trying to remove a hot tap, but it was tight. He then choked up on what he described as his "shotgun." As he jerked on the tap to get it loose, he fell backwards and later awoke inside a truck.

Barfield testified that Pepe Saenz, SandRidge's electrical supervisor, was assigned to check on his work while he performed in the field. Barfield described that "[Saenz] would come out and, you know, checked on us, checked on the other line crew, made sure we were doing our job." When asked whether Saenz controlled the details of his work, Barfield responded, "Yes, sir." Asked to describe "[i]n what way," Barfield explained, "[i]n the way that my boss didn't have the right to turn a line off without his permission." Barfield testified he heard Saenz tell Marty Stone to not turn any line off without his permission. Barfield further testified that "Pepe [Saenz] told

15

all of us that it would take us longer to turn the line off then it would to do the job." Barfield further described that "two or three days before we did this job. We were doing a big long neutral. We had a lot of crossovers. And Bowie asked him to turn it off, and he got mad and told him, 'Just do it. It will take you' – like I said, 'take you longer to do it without it.'" When testifying, Barfield's boss, Mike Lawson, also identified Pepe Saenz as SandRidge's electrical supervisor.

During his deposition, Saenz confirmed that SandRidge owned the electrical lines and substation where Barfield worked performing the contract for OTI. Saenz testified that SandRidge had purchased a field in Andrews from Arena Resources which did not have what they call a systems ground. To provide power to a new well, Saenz hired OTI to follow the drilling rig and install a neutral ground to the last point. At his deposition, Saenz was asked to further explain an interrogatory answer that had been given to a question asking about efforts he and/or SandRidge undertook to minimize the risk of electrical shock to Barfield and his coworkers prior to the incident in question. The interrogatory stated that "SandRidge will authorize electrical contractors to isolate work sites at isolation points upon request. This sometimes requires rescheduling jobs, which SandRidge does routinely."

Providing further explanation, Saenz testified that "depending on the well count or sites being affected, the job may have to be rescheduled to let production move more water, you know, give them time to move more water so the tanks don't overfill, get the pumpers out there to shut down wells, you know, like I said, depending on the account—the amount of—of pumping units, you know. But if it's, you know, two or three, you know, then my contractors have the authority to—to isolate them and go on about their business." He further added that it would be verbally discussed with contractors.

16

When asked if the practice was written down, he responded, "No, it's pretty much kind of an oil field common-sense type deal. You know, if you know your production numbers, you know, we're just not going to drive up and shut a 200-barrel-a-day well off, you know." Saenz then asserted that SandRidge must authorize isolation of work sites if isolation was going to be required. Contradicting testimony from Barfield, Sutherland, and Sosa, Saenz testified that the distribution line near Barfield's work did *not* need to be de-energized because he claimed that Barfield was not performing "hot work[.]"

Taking Barfield's evidence as true and resolving all conflicts in his favor, and indulging every reasonable inference, we conclude that the evidence raises a fact issue on whether SandRidge exercised "some control" over Barfield's work as required by section 95.003. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 95.003; *Chapa*, 11 S.W.3d at 155; *Painter*, 271 S.W.3d at 406. We hold that factual issues exist on whether SandRidge refused OTI's request to de-energize lines or otherwise required Barfield to work in close proximity to such lines without allowing Barfield to isolate or de-energize them in contravention of applicable safety practices. *See Lee Lewis Constr.*, 70 S.W.3d at 783 (holding that evidence established that general contractor retained the right to control fall-protection systems on the jobsite, and thus, could have prevented claimant's death if it had enforced its own safety rules requiring use of independent lifelines).

Additionally, we do not agree with SandRidge that it conclusively established it did not exercise "some control" over Barfield's work such that he was entirely free to do the work as he so chose. To advance this argument, SandRidge argues that Barfield himself admitted that Saenz was not at the job site at the time he was injured. A property owner, however, may retain control even when he or she is not directing the work at the time of the injury. *Lee Lewis Constr*, 70

17

S.W.3d at 784 (rejecting defendant's argument that no one saw employee fall at the time of the incident). SandRidge also asserts that the arguments advanced by Barfield to establish control over his work were considered and rejected by our sister court in *Dyall*, 152 S.W.3d at 706. We conclude that *Dyall* is distinguishable.

In *Dyall*, employees of an independent contractor were asked whether they could perform their repair of a leaking pipe at a paper mill while the facility remained operating even though the shift supervisor had ordered the plant to shut down when the leak was first discovered. *Id.* at 705. With the facility not operating, the line needing repair was then purged with water and the area around the leak was scrubbed down. *Id.* The facility then resumed its operations but was soon shut down a second time to allow other personnel to replace a cracked flange. *Id.* at 706. Only after measures were taken to eliminate hazards did the facility resume operating. *Id.* Based on these facts, we find *Dyall* distinguishable as the record had established that the property owner repeatedly closed its facility to purge the area where repairs were needed until further purging appeared to be unnecessary. Unlike the case at hand, no evidence in *Dyall* established that any personnel disregarded or refused a request from the independent contractor to shut down the facility at any time or otherwise demanded that workers proceed with their work even with a hazard knowingly present in disregard of applicable safety practices. *Id.* Given these important distinctions, we find *Dyall* to be of no assistance in this instance.

Accordingly, we conclude there existed a question of fact on whether SandRidge retained "some control" over the manner of Barfield's work at the time he was injured as required to satisfy the first prong of section 95.003. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 95.003(1).

18

**B.  Section 95.003's requirement of Actual Knowledge and Adequate Warning**

Next, we consider the actual knowledge and adequate warning elements required by the second prong of section 95.003.  To impose liability for damages arising from the failure to provide a safe workplace, section 95.003 requires that Barfield establish that SandRidge "had actual knowledge of the danger or condition resulting in the personal injury, death, or property damage and failed to adequately warn."  *See* TEX. CIV. PRAC. & REM. CODE ANN. § 95.003(2).

**1.  Actual Knowledge**

Construing the knowledge provision, the Texas Supreme Court noted that, in effect, "it grants the property owner additional protection by requiring the plaintiff to prove that the owner had actual knowledge of the danger or condition, so the owner is not liable based merely on what it reasonably should have known."  *Ineos USA, LLC v. Elmgren*, 505 S.W.3d 555, 561 (Tex. 2016) (citing *Id*. § 95.003(2)).  "Actual knowledge requires knowledge that the dangerous condition existed at the time of the accident, as opposed to constructive knowledge, which can be established by facts or inferences that a dangerous condition could develop over time."  *Id.* at 568.  As provided in section 95.003, the term "condition" is defined as "either an intentional or an inadvertent state of being."  *Abutahoun*, 463 S.W.3d at 49 (citing *Sparkman v. Maxwell*, 519 S.W.2d 852, 858 (Tex. 1975)).

Here, Barfield asserts that the summary judgment record establishes that SandRidge had actual knowledge of the dangerous condition of the premises—i.e., the presence of energized lines at the pole where Barfield worked—and despite such knowledge, SandRidge failed to provide an adequate warning.[4]  Responding, SandRidge does not deny its own knowledge of the danger that

---

[4] In its motion for summary judgment, SandRidge did not dispute that it possessed actual knowledge that the power

19

resulted in Barfield's injury, but rather, based on Barfield himself admitting he had actual knowledge of the energized line, SandRidge asserts it had no duty to warn of a condition that Barfield already knew about or one that was open and obvious.

As with the control requirement, the summary judgment record includes witness depositions and other documents on which Barfield relies to first establish SandRidge had actual knowledge of the presence of a dangerous condition at the time of his injury. Barfield testified that SandRidge had assigned Saenz to supervise the fieldwork of OTI. At the time, Barfield described that he was explicitly told by Saenz that the poles would remain energized while he was working. "[Saenz] told all of us that it would take us longer to turn the line off then it would to do the job." Barfield further stated that two or three days before, while installing a long neutral line, his coworker, Bowie, asked Saenz to turn off power and Saenz "got mad and told him, 'Just do it. It will take you' – like I said, 'take you longer to do it without it.'" Barfield described that they worked "[l]ots of hot line around them and stuff."

Additionally, deposition testimony from Richard Sosa, a Vice-President of SandRidge, also confirmed that Barfield performed work that was "technically hot work[.]" Sosa explained, "[Barfield's] not bare-handing, but he's working on a nonisolated circuit[]." Sosa further explained the danger of this type of work arises from a situation where "the individual somehow gets in contact with basically a phase and gets injured with the high voltage." Underscoring the awareness of the presence of danger, SandRidge's own safety-related work practices required de-

---

lines around which Barfield worked generally remained energized. SandRidge expressly disputed, however, that it had actual knowledge that "the maximum voltage in the lines was higher than expected due to the structure of the poles." In his brief, Barfield concedes that he did not contest the higher-than-expected-voltage argument in his response filed with the trial court. Barfield argues, "[t]he relevant hazard for which the summary judgment must be reversed is not that the lines were over capacity, but that they were energized at all."

energization of overhead lines unless it could be demonstrated that (1) de-energization would introduce additional or increased hazards; or (2) de-energization would be infeasible due to operational or design limitations.

Viewing the evidence in favor of Barfield, as we must, we conclude the evidence established that SandRidge had actual knowledge of the danger or condition at the time of the incident that resulted in Barfield's injury. Barfield adduced more than a scintilla of evidence to establish that SandRidge had actual knowledge of a dangerous condition that proximately caused his injury—i.e., that the electrical line overhead and the pole that he worked on remained energized while he worked in near proximity despite prohibitions against working in such a manner unless danger would otherwise be increased or be infeasible. In this instance, Barfield established that SandRidge not only had knowledge the lines would remain energized in proximity to workers, this condition was intentional and not unknown. *See Abutahoun*, 463 S.W.3d at 49 (chapter 95 defines "condition" as "either an intentional or an inadvertent state of being").

We note that SandRidge never asserted an absence of knowledge of the condition or a lack of awareness of the danger it posed. When applying chapter 95, courts consider the "juxtaposition between the work being done, where that work was being done, and the point of injury," all of which render "the point of injury a part of the improvement." *Torres*, 518 S.W.3d at 489-90 (conceiving the power line as an aspect of the improvement's state of being or as a condition of the improvement). Also, SandRidge did not produce evidence, nor does it argue, that de-energization increased danger or that it would have been infeasible due to operation or design limitations. Given no dispute about SandRidge having actual knowledge of a dangerous condition—which is coupled in this instance with the existence of a fact issue regarding

21

SandRidge's exercise or retention of control over the work performed by Barfield—we consequently must next consider whether the evidence established that SandRidge did not fail to provide an adequate warning. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 95.003(2).

### 2. Failure to Provide an Adequate Warning

Barfield argues that SandRidge gave no warning to eliminate danger, much less an adequate warning, in contravention of its own policies and the requirement of section 95.003 despite having actual knowledge of a dangerous condition. Countering, SandRidge argues that it owed no duty to warn of a dangerous condition that was already known by both OTI and Barfield. Said differently, SandRidge asserts that Barfield's own knowledge defeated any duty it may have otherwise owed to provide an adequate warning. Relying on *Austin v. Kroger Texas, L.P.*, 465 S.W.3d 193, 203 (Tex. 2015)—a premise liability case applying common law principles without chapter 95 involvement—SandRidge argues that the evidence conclusively established that Barfield and OTI themselves had actual knowledge of the presence of energized lines in the area where Barfield worked, and thus, no warning was required.

In *Kroger*, an employee of a store was injured while cleaning up an oily liquid at his workplace which he had been directed to clean by his supervisor. *Id.* at 198. The Texas Supreme Court initially explained the decision would address a certified question from the United States Court of Appeals for the Fifth Circuit on a matter of Texas law that appeared "arguably unclear." *Kroger*, 465 S.W.3d at 199. The Fifth Circuit asked for guidance on the nature and scope of an employer's duty to provide its employees with a safe workplace "when an employee is aware of the hazard or risk at issue." *Id.* In other words, the question at hand asked whether the employee's awareness of the defect would eliminate the employer's duty to maintain a safe

22

workplace. *Id.* More specifically, *Kroger* addressed whether an employee could recover against a non-subscribing employer for an injury caused by premises defect of which he was fully aware but that his job duties required him to remedy. *Id.* (citing Tex. Lab. Code Ann. § 406.033 (a)(1)-(3)). By its holding, *Kroger* clarified the circumstances under which an employer owed a duty to warn or protect its employees from unreasonably dangerous conditions existing on its premises when such conditions were open and obvious or known to the employee. *Id.* at 198.

Defining a property owner's duty, *Kroger* initially clarified that an employer has the same premises-liability duty to its employees as other landowners have to invitees on their premises. *Id.* at 201-202. Under these circumstances, an invitee is defined as "one who enters the property of another with the owner's knowledge and for the mutual benefit of both." *Id.* at 202 (citing *Motel 6 G.P., Inc. v. Lopez*, 929 S.W.2d 1, 3 (Tex. 1996) and *Rosas v. Buddies Food Store*, 518 S.W.2d 534, 536 (Tex. 1975)) (internal quotations omitted). Because employees fit the description of an invitee, *Kroger* recognized that the duty of an employer to make its premises reasonably safe for employees is "'in all material respects identical' to a landowner's duty to make its premises reasonably safe for invitees.'" *Id.* (citing *Sears, Roebuck & Co. v. Robinson*, 280 S.W.2d 238, 240 (1955); *see also Hernandez v. Heldenfels*, 374 S.W.2d 196, 197 (Tex. 1963) (holding that employee was invitee, rather than licensee, while working at his employer's premises)). *Kroger* confirmed that Texas jurisprudence treats employers as having the same premises-liability duties as all other landowners. *Id.*

To answer the question posed by the Fifth Circuit, *Kroger* next considered the premises-liability duties of landowners to invitees generally. *Id.* *Kroger* noted that "[a] landowner has a duty to exercise reasonable care to make the premises safe for invitees," regardless of whether the

23

duty owed is described as a duty to make reasonably safe, a duty to warn, or a duty to make safe or warn. *Id.* "While potentially confusing, these descriptions are not at odds with each other." *Id.* *Kroger* noted that the landowner can satisfy its duty by eliminating the dangerous condition or by mitigating the condition so that it no longer posed an unreasonable danger to its invitees. *Id.* (citing *State v. Williams*, 940 S.W.2d 583, 584 (Tex. 1996)). Or, as *Kroger* further noted, courts alternatively recognize that landowners can also satisfy their duty by providing an adequate warning of the danger when the danger remains on the premises. *Id.*; *see, e.g., Nabors Drilling U.S.A, Inc. v. Escoto,* 288 S.W.3d 401, 412 (Tex. 2009); *Brookshire Grocery Co. v. Goss*, 262 S.W.3d 793, 794 (Tex. 2008); *Gen. Elec. Co. v. Moritz*, 257 S.W.3d 211, 216 (Tex. 2008); *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *Shell Oil Co. v. Khan*, 138 S.W.3d 288, 295 (Tex. 2004).

Acknowledging a line of common law precedents, *Kroger* noted "[t]he Court has recognized that, in most circumstances, a landowner who provides an adequate warning acts reasonably as a matter of law, and since there is no need to warn against obvious or known dangers, a landowner generally has no duty to warn of hazards that are open and obvious or known to the invitee." 465 S.W.3d at 204 (citing *Goss*, 262 S.W.3d at 795; *Moritz*, 257 S.W.3d at 218; *Islas*, 228 S.W.3d at 651; *Jack in the Box, Inc. v. Skiles*, 221 S.W.3d 566, 568-69 (Tex. 2007); *Kroger Co. v. Elwood*, 197 S.W.3d 793, 795 (Tex. 2006); *Khan*, 138 S.W.3d at 295; *Coastal Marine Serv. of Tex., Inc. v. Lawrence*, 988 S.W.2d 223, 225 (Tex. 1999)). "When invitees are aware of dangerous premises conditions—whether because the danger is obvious or because the landowner provided an adequate warning—the condition will, in most cases, no longer pose an unreasonable risk because the law presumes that invitees will take reasonable measures to protect themselves

24

against known risks, which may include a decision not to accept the invitation to enter onto the landowner's premises." *Id*. at 203. Because there is no need to warn against obvious or known dangers, *Kroger* explained that a landowner generally has no duty to warn of hazards that are open and obvious or known to the invitee. *Id.* at 204. In such cases, a landowner has "no duty" to take safety measures beyond those that an ordinary, reasonable landowner would take under the same or similar circumstances. *Id.* What a reasonable landowner would do is often a jury question, yet courts do also recognize that occasionally it is not. *Id.*

Importantly, however, *Kroger* further clarified that the use of the qualifiers "generally," "ordinarily," and "in most cases," while discussing the general rule, has been necessary "because the Court has struggled at times with cases in which it concluded that the provision of a warning or the obvious nature of the danger was not sufficient to make the premises reasonably safe as a matter of law." *Id*. Given this struggle, *Kroger* clarified and reaffirmed the existence of exceptions under certain circumstances. *Id.* As *Kroger* explained, the general rule of no duty that otherwise applies when a warning is provided or the danger is open and obvious has two exceptions: (1) the criminal-activity exception; and, (2) the necessary-use exception. *Kroger*, 465 S.W.3d at 204. The first exception arises when a dangerous condition results from the foreseeable criminal activity of third parties. *Id.* And, the second arises when the invitee necessarily must use the unreasonably dangerous premises, and despite the invitee's awareness and appreciation of the dangers, the invitee is incapable of taking precautions that will adequately reduce the risk. *Id.* In cases involving these exceptions, *Kroger* reaffirmed that the obviousness of the danger and the invitee's appreciation of it may be relevant to a landowner's defense based on the invitee's proportionate responsibility, but in neither case, however, does the invitee's awareness itself

25

relieve the landowner of its duty to make the premises reasonably safe. *Id.*

Relying on *Kroger*, SandRidge essentially argues that evidence conclusively established that Barfield and OTI knew of the dangerous condition of an energized pole in near proximity to where Barfield worked, and thus, the obviousness of the danger and their awareness of it eliminated any duty whatsoever to provide an adequate warning. Barfield, however, counters with two arguments: (1) that his claim was governed solely by the liability provision of chapter 95, not by common law, as readily agreed to by both parties; and alternatively, (2) that chapter 95 does not incorporate a provision relieving a property owner's duty to provide an adequate warning for dangers that are known by a claimant or are otherwise open and obvious. As to his first argument, Barfield contends his own knowledge of the dangerous condition is not relevant to the question of whether SandRidge owed a duty to provide an adequate warning under section 95.003, when SandRidge's actual knowledge of a dangerous condition has been conceded or otherwise shown. As to his second argument, he asserts that if the open and obvious doctrine applies to his claim, then *Kroger's* necessary use exception would also apply to the circumstances at hand. Barfield argues it was necessary for him to work around the energized line to perform his assigned work given that SandRidge had control over the substation, lines, and power, generally, and it had refused requests by OTI crewmembers to de-energize the work area. With both parties' readily agreeing that chapter 95 governed the liability of the case, we turn first to its provisions.

When construing statutes, we must begin with the statute's language. *See Abutahoun*, 463 S.W.3d at 45. "We look to the plain meaning of the words in a statute as an expression of legislative intent." *Id.* at 46. When construing language, we are mindful that we may not "judicially amend a statute by adding words that are not contained in the language of the statute."

26

*Lippincott v. Whisenhunt*, 462 S.W.3d 507, 508 (Tex. 2015) (per curiam). Instead, we must presume the Legislature intended for each of the statute's words to have a purpose and that words not included were purposefully omitted. *Id.* at 509 (citing *In re M.N.*, 262 S.W.3d 799, 802 (Tex. 2008)). We further recognize "a fundamental principle of statutory construction that words' meanings cannot be determined in isolation but must be drawn from the context in which they are used." *Willacy County Appraisal District v. Sebastian Cotton & Grain, Ltd*., 555 S.W.3d 29, 39 (Tex. 2018). Likewise, "we presume the Legislature enacts a statute with knowledge of existing law." *Abutahoun*, 463 S.W.3d at 50 (citing *Dugger v. Arredondo*, 408 S.W.3d 825, 835 (Tex. 2013)).

Read as a whole, section 95.003 provides that "[a] property owner is not liable for personal injury, … [t]o an employee of a contractor … who constructs, repairs, renovates, or modifies an improvement to real property, including personal injury, … arising from *the failure to provide a safe workplace* unless: (1) the property owner exercises or retains some control … and (2) the property owner had actual knowledge of the danger or condition resulting in the personal injury, … and failed to adequately warn." TEX. CIV. PRAC. & REM. CODE ANN. § 95.003 (emphasis added). Because all the words of a statute must be afforded meaning, and their meaning must be drawn from the context in which they are used, concepts of "a safe workplace" and an "adequate warning" must be factored into the nature and scope of the liability imposed. *Cf. Torres v. Chauncey Mansell & Mueller Supply Co., Inc.*, 518 S.W.3d 481, 490 (Tex. App.—Amarillo 2017, pet. denied) (factoring the concept of "a safe workplace" into the meaning of "improvement" when construing chapter 95); *see also 20801, Inc. v. Parker*, 249 S.W.3d 392, 396 (Tex. 2008) ("We determine legislative intent from the entire act and not just isolated portions.").

On a plain reading, we note that section 95.003 does not mention that an adequate warning would *not* be required when a dangerous condition is known by the claimant or is open and obvious. *Id.* § 95.003(2). Nor does the language describe that the dangerous condition must be hidden, concealed, or unknown to the claimant before a duty is imposed on the property owner to provide an adequate warning of a danger then known to the owner. *Id.* Distinct from the general rule acknowledged in *Kroger*, section 95.003 does not include any language that indicates that the Legislature intended for a claimant's own knowledge of a danger to thereafter eliminate a property owner's duty to provide an adequate warning or a safe workplace in the event the owner had actual knowledge of the dangerous condition and had some control over the manner of the work being performed. As *Abutahoun* aptly observed, the liability protection provided by section 95.003, and its exception, focuses solely on circumstances of the property owner without any language pertaining to other actors. *Abutahoun*, 463 S.W.3d at 48 ("Despite identifying three potential defendants in the applicability provision of section 95.002, the Legislature limited only a property owner's liability in section 95.003."). In so doing, section 95.002 does not say anything "about the actor who causes the negligence claim to arise and makes no distinction between harm caused by a contractor's actions and harm caused by another's actions." *Id.*

We further note that when chapter 95 was enacted by the Legislature in 1995,[5] the so-called no-duty doctrine which SandRidge advances herein had already been abrogated under Texas common law after a short period of application. In *Robert E. McKee, Gen. Contractor v. Patterson*, 271 S.W.2d 391, 394 (Tex. 1954), *abrogated by Parker v. Highland Park, Inc.*, 565

---

[5] Act of May 18, 1995, 74th Leg., R.S., ch. 136, § 2, 1995 Tex. Gen. Laws 971, 976 (codified at TEX. CIV. PRAC. & REM. CODE ANN. § 95.003).

28

S.W.2d 512 (Tex. 1978), the court held that "there is no duty on the owner of premises to take precautions to protect his invitee from dangers on the premises of which the invitee is or should be fully aware and which he voluntarily encounters." This no-duty doctrine, however, was later abrogated by *Parker v. Highland Park, Inc.*, 565 S.W.2d 512, 517 (Tex. 1978) ("We now expressly abolish the so-called no-duty concept …. The reasonableness of an actor's conduct under the circumstances will be determined under principles of contributory negligence."). Among other reasons, *Parker* noted that "[t]he legislature by its adoption in 1973 of the comparative negligence statute evidenced a clear policy purpose to apportion negligence according to the fault of the actors." *Id.* at 518.

Thus, despite SandRidge's reliance on *Kroger*, we conclude that the language of section 95.003 does not support its application in the manner SandRidge advocates such that SandRidge would be protected from liability even after failing to provide an adequate warning of a dangerous condition of which it had actual knowledge. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 95.003; *see also Abutahoun*, 463 S.W.3d at 48. Our decision in this instance, however, should only be read in the context of the grounds for summary judgment which were actually raised by SandRidge's motion. At this juncture, we have not been asked, nor do we address, any argument about the comparative fault defense alleged by SandRidge in its defensive pleading. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 33.001 – 33.004.

Having rejected SandRidge's no-duty argument as related to section 95.003, we next consider whether Barfield carried his evidentiary burden to raise an issue of fact on the element of adequate warning. If the summary judgment evidence conclusively establishes that SandRidge adequately warned Barfield of the dangerous condition, then SandRidge could not be held liable

29

pursuant to section 95.003. *See id.* § 95.003(2). To be adequate, a warning must be more than a general instruction such as "be careful." *Henkel v. Norman*, 441 S.W.3d 249, 252 (Tex. 2014). Rather, the warning must notify of the particular condition and be taken in context of the totality of the circumstances. *Id.*

Here, Barfield argues there is a genuine issue of material fact as to the adequacy of SandRidge's warning. Barfield argues that an adequate warning required SandRidge to follow the work policies in effect which it had imposed not only on its own workers but also on OTI and other contractors. Barfield argues that SandRidge had promulgated certain work practices to ensure that contractors and their employees would be adequately warned of dangerous conditions. To support its argument, Barfield relies on training materials produced by SandRidge which establish the procedures that should have been followed to satisfy the requirement of an adequate warning. The materials include Arc Flash Training provided by Palmetto Engineering & Consulting/ASAG which SandRidge asserted it had provided to all its contractors.[6]

Given the context of the work environment, the training materials required that SandRidge and OTI inform each other of existing hazards relevant to their worksite, to coordinate with a meeting and documentation, and to employ safe work practices when warranted, to include use of personal protective equipment and safe work procedures. Notably, Arc Flash training indicated that "[l]ive parts to which an employee might be exposed shall be put into an electrically safe work condition before an employee works on or near them ... ***unless*** the employer can demonstrate that de-energizing introduces additional or increased hazards or is infeasible due to equipment design

---

[6] Without providing details, Barfield asserts that the Palmetto training documents incorporate multi-employer relationships as described by the National Fire Protection Act 110.5(B) ("NFPA").

or operational limitations." Examples given of "[i]ncreased or [a]dditional [h]azards" include "[t]he interruption of life support equipment, deactivations of emergency alarm systems, and shutdown of hazardous location ventilation equipment." "Infeasible due to [o]perational or [d]esign [l]imitations," includes "[p]erforming diagnostics and testing (e.g., startup or troubleshooting) of electric circuits that can only be performed with the circuit energized and work on circuits that form an integral part of a continuous process[.]"

Training materials further provided that "[w]henever outside servicing personnel are to be engaged in activities covered by the scope and application of this standard, the on-site employer and the outside employer(s) shall inform each other of existing hazards, personal protective equipment/clothing requirements, safe work practice procedures, and emergency/evacuation procedures applicable to the work to be performed. This coordination shall include a meeting and documentation." Despite the specified requirements, SandRidge's onsite supervisor, Jose "Pepe" Saenz, testified that SandRidge gave no warning to Barfield nor did it coordinate with him to implement safe procedures. As stated earlier, the master service agreement with OTI required that Barfield perform his electrical work subject to SandRidge's safety rules or other applicable regulations. Rather than contend that an adequate warning was given, SandRidge argues "[t]here [was] no evidence that Barfield and OTI did not perceive and understand the hazards associated with working near energized lines." Given that the evidence raises without resolving the question of whether Barfield would be bound to follow safe work procedures applicable to the circumstances, we are not persuaded by SandRidge's argument that it owed no coordination of safe work practices based on Barfield's status as an independent contractor.

Under the circumstance, the implementation of a safe work practice included de-energization of live parts to which an individual may be exposed "before the person works on or near them, unless it can be shown that de-energizing introduces additional or increased hazards, or is infeasible due to equipment design or operational limitations."  Instead of following the safe work practice, Saenz testified as follows:

> [Question]: Y'all don't go out there and look at the banks or look at the lines or anything like that? You're just, like, get after it and get it done?
>
> [Saenz]: Yes, sir.
>
>    .   .   .
>
> [Question]: … So before the job starts or during the job, does Monty or yourself or anybody from SandRidge go out and have a tailgate meeting? Do y'all do a joint JSA? Is there some type of orientation? Does anything happen, or do these guys just go out and do the job?
>
> [Saenz]: They just go out and do the job.

Under the totality of the circumstances, we conclude that Barfield's evidence raised a genuine issue of fact about SandRidge's conduct with regard to the provision of an adequate warning or a safe workplace.  To prevent electric shock or other injuries resulting from contact with equipment that remained energized, whether directly or indirectly, the applicable safety practice required that SandRidge, at minimum, participate in a coordinated meeting with OTI to inform workers of existing hazards and the proper use of protective equipment and implementation of safety practices.  Although assigned to supervise, Saenz admitted that no such coordination occurred with OTI before the modification work was performed. Instead, when referring to OTI, Saenz described "[t]hey just go out and do the job."  Even though SandRidge argues that Barfield and OTI perceived and understood the hazards associated with working near energized lines,

32

nonetheless, the liability protection of section 95.003 requires an adequate warning when a dangerous condition is known by a property owner. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 95.003. In short, Barfield's awareness of danger is not relevant to the question of whether SandRidge failed to provide an adequate warning of the danger it had actual knowledge of even though Barfield's own knowledge may otherwise be relevant to his proportionate responsibility, if any, over injuries he claimed. Accordingly, we conclude that there is more than a scintilla of evidence to raise a genuine issue of fact as to whether SandRidge breached its statutory duty to adequately warn of the hazard of working near energized parts given SandRidge's actual knowledge of such danger. *See id*. § 95.003. In summary, after examining the summary judgment record in the light most favorable to Barfield, indulging every reasonable inference and resolving any doubts against SandRidge, as we must, we hold that fact issues were presented as to the statutory requirements of section 95.003. *See id*. §§ 95.002, .003.

Accordingly, we sustain Barfield's first and second issues.

## CONCLUSION

We hold that Jose "Pepe" Saenz is entitled to judgment in his favor. We also hold that SandRidge is not entitled to summary judgment—on either no-evidence or traditional grounds—on Barfield's claim. Accordingly, we affirm in part the portion of the trial court's judgment in favor of Saenz; and, we reverse and remand for further proceedings the portion of the judgment in favor of SandRidge.


                                                    GINA M. PALAFOX, Justice

March 27, 2020

Before Alley, C.J., Rodriguez, and Palafox, JJ.
Alley, C.J., dissenting